## COUNT TWO

(Wire Fraud)

90. The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

91. On or about December 30 and 31, 1998, in the District of Massachusetts and elsewhere,

## GRAHAM JAMES MARSHALL,

defendant herein, having devised and intending to devise a scheme or artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings signs, signals and pictures for the purpose of executing such scheme and artifice, to wit, the facsimile transmission from Providence, Rhode Island, to Boston, Massachusetts, of a putative "letter agreement" dated December 28, 1998, which purported to reflect an agreement for Inso to pay $160,000 to Hong Hong Printing Company, and which reflected a forged signature of Chan Hong Saik.

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS THREE - FOUR

### (Wire Fraud)

92. The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

93. On or about the following dates, in the district of Massachusetts and elsewhere,

### BRUCE GORDON HILL,

defendant herein, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, to wit:

| Count | Date | Description |
|---|---|---|
| Count 3: | December 30-31, 1998 | Fax transmission from Penang, Malaysia, to Boston, Massachusetts depicting a check, in the amount of 11,552,000 Ringgits. |
| Count 4: | December 29-31, 1998 | Telephone conversations between BRUCE GORDON HILL, in Penang, Malaysia, and others known to the Grand Jury in Boston, Massachusetts, concerning arrangements for issuance of letters of credit. |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT FIVE

(Circumventing Internal Accounting Controls)

94. The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

95. On various dates between in or about September 1998 and in or about April 1999, in the District of Massachusetts and elsewhere,

## GRAHAM JAMES MARSHALL,

defendant herein, did knowingly and willfully circumvent and cause others to circumvent, and did fail to implement and cause others to fail to implement, a system of internal accounting controls and knowingly falsify books, records, and accounts described in Section 13(b)(2) of the Securities Exchange Act of 1934 [Title 15, United States Code, Section 78m(2)] by concealing from Inso's finance department personnel, including Inso's CFO, oral assurances he made to Chan on or about September 30, 1998, and by providing Inso's CFO forged and fraudulent documents and information concerning the payment of $160,000 to Chan on or about December 31, 1998.

All in violation of Title 15, United States Code, Section 78m(b)(5) and 78ff [Securities Exchange Act of 1934, Sections 13(b)(5) and 32], 17 C.F.R. §§240.13b2-1 and 240.13b2-2, and Title 18, United States Code, Section 2.

## COUNT SIX

(Material Omissions and False Statements by Corporate Officer to Accountant)

96.   The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

97.   In or about January 1999, in the district of Massachusetts and elsewhere,

BRUCE GORDON HILL,

defendant herein, being an officer of an issuer of securities regulated under the Securities Exchange Act of 1934, to wit, Inso Corporation, did directly and indirectly falsify and cause to be falsified books, records and accounts of Inso Corporation, and did directly and indirectly, make and cause to be made materially false or misleading statements, and did omit to state, and caused another person to omit to state, material facts necessary in order to make such statements, in the light of the circumstances under which such statements were made, not misleading, to an accountant: (1) in connection with an audit or examination of the financial statements of the issuer required to be made pursuant to the rules and regulations of the Securities Exchange Commission under the Securities Exchange Act of 1934; and (2) in the preparation and filing of documents and reports required to be filed with the Securities Exchange Commission under the Securities Exchange Act of 1934.

All in violation of Title 15, United States Code, Section 78m(b)(5) and 78ff [Securities Exchange Act of 1934, Sections 13(b)(5) and 32], 17 C.F.R. §§240.13b2-1 and 240.13b2-2, and Title 18, United States Code, Section 2.

## COUNT SEVEN

### (Perjury)

98. The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

99. On or about August 23, 2000, in the District of Massachusetts and elsewhere,

### GRAHAM JAMES MARSHALL,

defendant herein, having duly taken an oath before a competent tribunal, officer, and person, in a case in which a law of the United States authorized an oath to be administered, that he would testify, declare, depose, and certify truly, willfully and contrary to such oath stated material matters which he did not believe to be true, that is, GRAHAM JAMES MARSHALL, having been duly sworn by an official of the United States Securities and Exchange Commission, did testify as follows:

> Q   I'm handing you Exhibit 157 which is a letter from Hong Hong -- rather, it's a letter to Hong Hong Printing from you and it's signed by both you and Mr. Chan, is that right?
>
> A   Uh-huh.
>
> Q   That was a "yes", wasn't it?
>
> A   Yes.

In actuality, as GRAHAM JAMES MARSHALL well knew, the letter in question was a forgery which contained a photocopy of Chan's signature, taken from a previous letter that Chan had sent to MARSHALL.

And did further testify as follows:

> Q   Was the consulting arrangement that you entered with Mr. Chan simply a justification for paying him for the money due him under the US Air deal?

> A    I certainly didn't feel so. I think it's -- you know, had the US Air deal gone through, he'd have ended up with $320,000 which I think everybody would have felt happy about. I think it was -- from the AIX perspective, it was very very good business to have him do it and from the US Air deal, you know, it wasn't my problem, I wasn't really worrying about that. I was looking forward to the EBX deal which seemed to me the -- you know, the only thing that I was really worried about, the historic thing was really the -- you know, was going to happen or not going to happen but I didn't feel any responsibility for that.
>
> Q    Well, sitting here today --
>
> A    Uh-huh.
>
> Q    -- can you testify that the consulting arrangement with Mr. Chan was not simply justification for a payment to him that he had been looking for for many months for the US Air deal?
>
> A    Yes, I can. The -- we absolutely discussed in detail the AIX port over a considerable period of time and we did discuss a consulting arrangement. You know, the events during those three months meant that -- you know, I think I pointed out that though I'm not sure that I shared the proof of concept in detail with him but events overtook it and he got beyond the need for proof of concept, he got to the position where he was comfortable that his engineering team could do the AIX port.

In actuality, as GRAHAM JAMES MARSHALL well knew, there was no consulting arrangement with Chan or his companies and Chan never agreed that he or his companies would perform any work to develop an AIX port. As GRAHAM JAMES MARSHALL well knew, he had fabricated evidence of such an arrangement in order to create a written justification for paying Chan $160,000 in connection with Chan's September 30, 1998 signing of a "purchase order" in connection with the US Airways deal.

And did further testify as follows:

> Q    Can you think of a reason that Mr. Chan would understand that payment to have been for the US Air deal?

22

[COUNSEL FOR MARSHALL] Don't guess. He signed a document saying it was not.

A [by MARSHALL]: Yeah, and I think the amounts were the same, as we have said so he'd sent two different lots of payment instructions. There was a lot of transactions going on at that time and I can't speak for his frame of mind.

Q   Well, is there any reason that you know of that he would say the only payment he received from Inso was for the US Air deal?

[COUNSEL FOR MARSHALL] Don't guess.

A [by MARSHALL]: No, there's no -- I can't conjecture that.

Q   You can't think of any reason?

A   No.

In actuality, as GRAHAM JAMES MARSHALL well knew, the only $160,000 payment that Chan expected from Inso was Chan's commission for signing the September 30, 1998 "purchase order" in connection with the U.S. Airways deal. As GRAHAM JAMES MARSHALL well knew, he had never discussed with Chan any arrangement to pay Chan or his companies for AIX porting or any other software development work. As GRAHAM JAMES MARSHALL well knew, he had fabricated evidence of such an arrangement in order to create a written justification for paying Chan $160,000 in connection with Chan's September 30, 1998 signing of a "purchase order" in connection with the US Airways deal.

All in violation of Title 18, United States Code, Section 1621.

## COUNT EIGHT

### (Perjury)

100. The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

101. On or about September 6, 2000, in the District of Massachusetts and elsewhere,

**BRUCE GORDON HILL,**

defendant herein, having duly taken an oath before a competent tribunal, officer, and person, in a case in which a law of the United States authorized an oath to be administered, that he would testify, declare, depose, and certify truly, willfully and contrary to such oath stated material matters which he did not believe to be true, that is, BRUCE GORDON HILL, having been duly sworn by an official of the United States Securities and Exchange Commission, did testify as follows:

> Q   Let me rephrase my question. I think I'm going to short-circuit the answer, if I may, and just ask you when you anticipated . . . that the wire was necessary to replace the check.
>
> A   At some point in January when the check had been presented and outstanding for some period of time, negotiations continued to resolve [sic] around the letters of credit. I began to have concerns about, A, the ability of the check to clear through the Malaysian banking system, the original issue raised by Hong Saik. And as time went by, whether -- in fact, irrespective of whether those were the reasons whether Hong Saik -- Hong Saik would manipulate the check process in order to ensure that payment was not made until the letters of credit were issued.

In actuality, as BRUCE GORDON HILL well knew, at or about the time he received the check, on or about December 30-31, 1998, he learned that the check was not intended as actual payment for the September 30 purchase order, but that a wire transfer of funds would be used for that

24

purpose. Further, as BRUCE GORDON HILL well knew, arrangements for a wire transfer commenced within less than one week after the check had been presented.

All in violation of Title 18, United States Code, Section 1621.

## COUNT NINE
(Perjury)

102. The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

103. On or about, November 9, 2000, in the District of Massachusetts and elsewhere,

BRUCE GORDON HILL,

defendant herein, having duly taken an oath before a competent tribunal, officer, and person, in a case in which a law of the United States authorized an oath to be administered, that he would testify, declare, depose, and certify truly, willfully and contrary to such oath stated material matters which he did not believe to be true, that is, BRUCE GORDON HILL, having been duly sworn by an official of the United States Securities and Exchange Commission, did testify as follows:

Q   Did you instruct Mr. Levitt to prepare the documents that FleetBank would need for the letters of credit?

A   I think what I said to Jon was, "You need to work with Betty to document this transaction". My experience with banks has been that typically they use their own form documentation so it would be more a question of him reviewing documentation but yes, assisting in the preparation of documents for this transaction.

Q   At some point in your conversations with Betty Savage and Jon Levitt, did they inform you about some of the documentation that Fleet required?

A   I recall that there were discussions about ancillary documentation apart from the letters of credit themselves and I believe it was around one of those conversations that I said to Jon, "Whatever authorization approval you need from me to facilitate these transactions, you have it".

* * *

Q   Did you tell him that whatever documents he could execute as assistant secretary, he could go ahead and do so?

26

A    I think what I said to him was more general than that, it was probably -- the substance of it was, "Jon, whatever approval you need from me", you know -- I may have even have said to him, "Whatever documents you need to execute on my behalf, go ahead and do it".

Q    And did you tell him to use your signature stamp in order to do that?

A    I may well have done so, I don't specifically recall saying that but I may well have done so.

\* \* \*

Q    When you talked to Mr. Levitt or Betty Savage about the documentation needed for the letters of credit with FleetBank, did either of them inform you that FleetBank required an opinion letter and a certificate of secretary?

A    I don't recall that they did.

Q    Did you instruct Jon Levitt to prepare an opinion of counsel letter for your signature?

A    I don't specifically recall that I did.

Q    Did you instruct him to prepare a certificate of secretary for his signature as assistant secretary?

A    I don't recall that I did, no.

Q    Does your answer mean that you don't know one way or another or that you think you did not?

A    I don't have a memory of any conversation of that type. The conversation I can remember is the conversation I've already described where I said to Jon, in effect, "If you need my approval, my authorization to", you know, "get any documents prepared or executed, you have it". I don't remember any specific conversation about what precisely those documents were other than that there was an actual, I believe, letter of credit sent to me and that maybe that I remember that 'cause I've seen it in these proceedings but that's a document that I do remember seeing and discussing.

Q    In conversations with Betty Savage or Jon Levitt, did either of them read, to you, a board resolution that was part of a certificate of secretary for FleetBank?

A    I don't recall that they did, that either of them did.

Q    Did they read, to you, a certificate of secretary?

27

A   I don't recall that they did.

Q   We, I believe, looked at a certificate of secretary the last time you were --

A   Yes.

Q   -- here, do you remember that?

A   Yes, I do.

* * *

Q   Let me hand you what was previously marked as Exhibit 177, which is the two documents which we looked at before when you were here. The first three pages is a letter to FleetBank and the last page is a certificate of secretary, do you agree with that?

A   Yes.

Q   And referring to the first three pages, the letter, did Jon Levitt or Betty Savage paraphrase and or read to you this letter?

* * *

Q   Why don't you answer whether they read it to you verbatim first?

A   I do not have a recollection that they read these documents to me.

Q   Did either of them paraphrase the first three pages of this Exhibit for you over the telephone while you were in Malaysia?

A   The memory I have is that Jon, in the context of one of the conversations I had, informed me that there were certain documents that would need to be executed and I believe that that's the extent of any paraphrasing I remember.

* * *

Q   Item one contains a board resolution --

A   Yes.

Q   -- do you see that?

A   Yes.

28

Q    Did anyone read that resolution to you verbatim over the telephone while you were in Malaysia?

A    Again, I don't have a memory that they did, I would say, obviously, what I said before, which is, I was operating, again, after a long trip without a lot of sleep but I don't have a memory that this document was read to me.

Q    Did Mr. Levitt tell you that he was not comfortable, signing his name to a certificate of secretary and had prepared it for your signature instead?

A    I do not recall that he did.

Q    Do you recall any document that Mr. Levitt said he was not prepared to sign relating to the letters of credit?

A    No, I do not recall, I do not have a recollection of any such document.

* * *

Q    Did you review any documentation that required your stamp or signature while you were in Malaysia?

A    I do not recall that I did. As I said, I received some documents by fax, one of which I think was the letter of credit and another document may have been a draft of the distribution agreement associated with the letters of credit but other than that, I don't recall any other documents were sent to me.

Q    Were any documents reviewed with you verbally over the telephone pertaining to the letters of credit?

A    I believe I had conversations with Jon and with Betty and possibly with both of them about both the distribution agreement and the letters of credit themselves.

Q    In those conversations, did you review any of the documentation with them?

A    Any documentation other than those two documents?

Q    Yes.

A    I don't recall that I did, no.

In actuality, as BRUCE GORDON HILL well knew, while he was in Malaysia in December 1998, he had a telephone conversation with an Inso attorney who informed him that Inso's bank

requested a Certificate of the Secretary of Inso Corporation and Opinion of Counsel in connection with the Letters of Credit that were being issued for Mr. Chan's benefit. The Inso attorney read to BRUCE GORDON HILL the substantive text setting forth the Opinion of Counsel and discussed the Certificate of Secretary. The Inso attorney expressed concern to BRUCE GORDON HILL about language in the certificate which asserted that Inso's Board of Directors had acted to authorize the issuance of the letters of credit, when there had been no such action by the Board of Directors. BRUCE GORDON HILL approved that text and authorized the Inso attorney to use Hill's signature stamp to affix his signature on the Certificate of Secretary.

All in violation of Title 18, United States Code, Section 1621.

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS    May _5_, 2004 @ 1:15 PM

Returned into the District Court by the Grand Jurors and filed.

_____
Deputy Clerk