UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 03-10344-DPW

| | |
|---|---|
| UNITED STATES OF AMERICA | VIOLATIONS: |
| v. | 15 U.S.C. §§78j(b) and 78ff; 17 C.F.R. §240.10b-5 (fraud in connection with offer, purchase or sale of security) |
| GRAHAM JAMES MARSHALL and | |
| BRUCE GORDON HILL, | 15 U.S.C. §78m(b)(5),17 CF.R. §§240.13b2-1 and 240.13b2-2 and 78ff (circumventing internal |
| Defendants. | accounting controls, material omissions and false statements by corporate officer to accountant) |

18 U.S.C. §1343 (wire fraud)

18 U.S.C. § 1621 (perjury)

18 U.S.C. §2 (aiding and abetting)

## SECOND SUPERSEDING INDICTMENT

The Grand Jury charges that, at times pertinent to this Indictment:

1.    GRAHAM JAMES MARSHALL (MARSHALL) was an individual who resided at Lexington, in the District of Massachusetts.

2.    Beginning in or about January 1997 and continuing until in or about April 1999, defendant MARSHALL was Vice President and general manager of the electronic publishing solutions division of Inso Corporation, Inc. ("Inso").

3.    Defendant BRUCE GORDON HILL ("HILL") was an individual who resided at Belmont, in the District of Massachusetts.

4.    Beginning in or about March 1994 and continuing through March 1999, defendant HILL was Vice President, Secretary, and General Counsel of Inso Corporation, Inc. ("Inso").

5.    Inso was a Delaware corporation with its headquarters in Boston, Massachusetts, and with offices and/or sales representatives worldwide.

6.    Inso was a corporation whose stock was publicly traded.

7.    Inso was in the business of developing, producing and supplying software used in the sharing and publishing of electronic information.

8.    Inso's common stock was traded on the NASDAQ National Market System and registered with the United States Securities and Exchange Commission (SEC) pursuant to Section 12(g) of the Securities Exchange Act of 1934.

9.    Inso derived revenue primarily from the sale of software licenses, from software maintenance fees, and from royalties received in connection with license arrangements with resellers.

10.    As required for a publicly traded company subject to the Securities Exchange Act of 1934, Inso routinely reported the financial results of its operations, including its revenues, in quarterly and annual reports to the SEC and to the public.

11.    Inso's board of directors, in consultation with management, set quarterly and annual revenue goals for the company.

12.    Inso's success or failure in meeting internal revenue goals and in meeting public expectations for Inso's revenues affected both the price of Inso's publicly traded stock and the payment of bonuses to senior Inso officials.

13.    In or about early 1998, Inso adopted as its revenue recognition policy Statement of Position 97-2 ("SOP 97-2"), entitled "Software Revenue Recognition," as amended, issued by the American Institute of Certified Public Accountants.  SOP 97-2 requires the following in order to recognize revenue from the sale of software: (a) persuasive evidence of an arrangement exists; (b)

delivery has occurred; (c) the vendor's fee is fixed or determinable; and (d) collectibility is probable. SOP 97-2 also requires consideration of "informal communications, or other factors [that] indicate that payment is substantially contingent on [a] reseller's success in distributing...the product."

## THE SECURITIES AND WIRE FRAUD SCHEME

14.    As set forth below, in or about September and October 1998, defendants MARSHALL and HILL, together with others known and unknown to the grand jury, arranged to prepare and to obtain a signature on a purchase order, dated September 30, 1998, which purported to reflect a sale of $3,200,000 in software licenses to a Malaysian business.

15.    A major objective of the efforts to obtain the September 30 purchase order was to create the false appearance that Inso had sold the software licenses during the third quarter of 1998.

16.    As set forth below, between in or about November 1998 and January 1999, defendants MARSHALL and HILL, together with others known and unknown to the grand jury, took a series of steps to create the appearance that the Malaysian business paid Inso $3,000,000 for the September 30 Purchase Order and to conceal material facts about the circumstances surrounding the creation and receipt of the purchase order as well as Inso's subsequent receipt of "payment" for that purchase order.

17.    As set forth below, in late December 1998, defendant HILL entered into an arrangement whereby the owner of the Malaysian business agreed to pay Inso $3,000,000 in exchange for $4,000,000 in letters of credit to be provided by Inso's bank.

18.    A major objective of the cover-up efforts during November 1998 through January 1999 was to conceal the fact that significant revenues which Inso had publicly reported for the

third quarter of 1998–namely approximately $2,996,000 in revenues attributable to the September 30 Purchase Order–were not collectable, and to avoid canceling or reversing those revenues.

### Fraudulent $3.2 Million Sale To a Malaysian Software Company on September 30, 1998

19.   Throughout 1998, Inso had been trying to close a sale of software licenses to US Airways for approximately $3,000,000. Had it been completed, the sale would have been one of the largest sales transactions in Inso's history. In addition, Inso executives believed the sale would be a strategically important one for the company.

20.   As of the last day of the third quarter, September 30, 1998, Inso's sales team still had not concluded the hoped-for sale to US Airways. MARSHALL and other Inso managers realized that Inso was not going to get a signed contract from US Airways in time to record the hoped-for $3 million of revenue in Inso's books for the third quarter of 1998. Without this hoped-for revenue, Inso's revenues for the third quarter of 1998 would have fallen significantly short of revenue goals.

21.   Even though no distributor had been involved in the US Airways deal prior to the end of the third quarter of 1998, on or about the evening of September 30, 1998, senior Inso managers agreed to try to find a distributor who would purchase the software associated with the hoped-for US Airways deal before midnight, in order to allow Inso to recognize revenue for the transaction in the third quarter of 1998.

22.   Under Generally Accepted Accounting Principles ("GAAP"), sales of product to distributors may be recognized as revenue in the quarter in which they occur if all conditions for revenue recognition are met, including, among other things, that the distributor takes financial responsibility for paying for the product purchased.

4

23.    In or about the afternoon of September 30, 1998, MARSHALL agreed to attempt to locate a distributor who would purchase the software that Inso anticipated selling to US Airways.

24.    On or about September 30, 1998, MARSHALL contacted a general manager employed by a large systems integration company (Company A), which anticipated providing software systems integration services to US Airways in the event that Inso completed its hoped-for sale to US Airways.  MARSHALL proposed that Company A purchase approximately $3 million of software and hold it until Inso sold that software to US Airways.  MARSHALL requested that Company A place an order for the software that same day - before the end of the third quarter.  MARSHALL told the manager from Company A that Inso was certain to obtain the order from US Airways within a short time, and that the transaction would present no risk to Company A.  MARSHALL promised that Company A would receive a sales commission for the order, and assured the manager that Company A would not be required to take any responsibility for selling the software to US Airways.  The manager from Company A rejected MARSHALL's proposal.

25.    After conferring with senior Inso managers, MARSHALL agreed to contact a business acquaintance in Malaysia with whom MARSHALL had previously done business, Chan Hong Saik ("Chan"), the owner of Hong Hong Printing, a Malaysian company ("Hong Hong"), and other business entities.

26.    On or about the evening of September 30, 1998, MARSHALL telephoned Chan at Chan's home in Malaysia and asked if Chan would agree to act as a "distributor" for Inso's sale to US Airways.  MARSHALL told Chan that Inso's sale to US Airways was imminent, but that he needed an order from Chan that day.  MARSHALL told Chan that Inso would pay him a

commission of 5% in return for placing the order. MARSHALL also told Chan that Inso was sure to close the sale to US Airways shortly. MARSHALL assured Chan that he would not have to pay for any order placed.

27.    Shortly after speaking with Chan, MARSHALL informed senior Inso officials that Chan might place the order.

28.    Immediately thereafter, defendant HILL drafted a "purchase order" to reflect the purchase by an unnamed company, designated only as "Inso Reseller ('VAR')."

29.    After revisions, the "purchase order" purported to reflect a purchase from Inso of software licenses, for a "US$3,200,000 one-time license fee (less five percent discount to VAR of US$160,000) perpetual license." The "purchase order" stated that it was "non-cancellable (sic) and non-refundable" and provided that payment in full was due "on the earlier of December 31, 1998 or two business days after VAR has received payment from end user customers."

30.    At approximately 9:00 to 10:00 p.m. EST on September 30, 1998, Inso received a fax of the purchase order, signed by Chan. The signature block in the purchase order, as faxed, reflected "Hong Hong Corporation" as the name of the VAR.

31.    Hong Hong Corporation, which Chan owned, was a shell corporation with no active business operations, which Chan owned.

32.    MARSHALL concealed from Inso's personnel responsible for financial reporting the oral assurances that MARSHALL had given Chan, that Chan's company would not be obligated to pay any money based on the September 30 purchase order.

33.    Based upon the receipt of the purchase order signed by Chan, in the third quarter of 1998, Inso recorded approximately $2,996,000 in revenue from the "sale" of software to Hong Hong Corporation.

## Reporting Third Quarter 1998 Financial Results

34.     On or about October 15, 1998, Inso issued a press release announcing that its revenue for the quarter ended September 30, 1998 was $18,707,000.

35.     On or about November 16, 1998, Inso filed with the SEC a quarterly financial report on Form 10-Q, which reported third quarter 1998 revenues of $18,707,000. This statement of revenue allowed Inso to meet its third quarter revenue targets. Without the revenue from the purported order from Hong Hong Corporation, Inso would have fallen significantly below its third quarter revenue target.

36.     On or about December 18, 1998, Inso filed with the SEC a registration statement on Form S-3, relating to Inso's offering of $29 million of common stock in connection with its acquisition of another software company. The Form S-3 incorporated by reference Inso's Form 10-Q filed for the third quarter of 1998 that contained false and misleading revenue information.

37.     Inso's public statements concerning its third quarter 1998 revenue, including its press release, its Form 10-Q, and its Form S-3, falsely overstated Inso's revenue for the third quarter of 1998 by including approximately $2,996,000 of revenue attributed to the "sale" of software to Hong Hong Corporation.

## Fourth Quarter 1998: The "OEM" Deal

38.     In October 1998, MARSHALL traveled to Malaysia and met with Chan to solicit Chan's interest in a bona fide software licensing agreement (the "OEM" agreement) that would allow one of Chan's companies to integrate an Inso software product into an electronic banking system that Chan's companies produced.

7

39.    As Inso's sales efforts in connection with the OEM agreement progressed during October, November and December 1998, the OEM agreement was expected to enable Inso to record approximately $2,600,000 in revenue during the fourth quarter of 1998.

40.    In or about November and December 1998, Inso's Chief Financial Officer informed senior Inso managers that Inso would not be permitted to recognize revenue from any fourth quarter sale of software to Chan so long as the September 30, 1998 order remained unpaid.

### Collapse of the US Airways Deal

41.    During the fourth quarter of 1998, Inso's sales team continued their efforts to complete a major software sale to US Airways, without success.

42.    In or about November and December 1998, MARSHALL and HILL, along with other Inso managers, learned that Inso had encountered a setback in its negotiations with US Airways, and that the sale to US Airways was not expected to close in the near future.

43.    In or about November and December 1998 and continuing into January 1999, MARSHALL and other senior Inso managers sought to avoid reversing the recognition of $2,996,000 in revenue (ie. the "sale" to Hong Hong Corporation), which Inso had included in its publicly reported revenues for the third quarter of 1998.

44.    Although MARSHALL had told Chan that he would not have to pay for the September 30, 1998 purchase order, by its terms the purchase order from Hong Hong Corporation to Inso provided that a payment of $3,040,000 would be due as of December 31, 1998.

45.    MARSHALL also knew that Chan did not intend to pay for the September 30, 1998 purchase order until Inso succeeded in arranging to sell the software to another customer.

8

### The Inso Australia Deal

46.    In or about November and December 1998, MARSHALL and other senior Inso managers discussed a variety of arrangements whereby Inso's anticipated sales to other customers could be routed through Chan, in order to provide Chan with money to pay Inso $3,040,000 for the September 30, 1998 purchase order.

47.    In or about November and December 1998, MARSHALL learned of a proposal to sell Chan Inso's far east subsidiary (Inso Australia), a transaction that was designed as a mechanism for channeling sufficient revenue to Chan to induce him to pay $3,040,000 for the September 30, 1998 purchase order.

48.    In or about October, November and December 1998, Chan stated that he was not interested in purchasing Inso Australia, or in becoming a distributor for the Inso Australia territory.

### Chan's $160,000 "Commission"

49.    In or about October, November and December 1998, MARSHALL knew that Chan expected to make an immediate profit of $160,000 for signing the September 30, 1998 purchase order.

50.    In or about October, November and December 1998, MARSHALL received multiple communications from Chan inquiring when Inso would pay him the $160,000 profit that MARSHALL had assured him he would receive for signing the September 30, 1998 purchase order.

51.    In or about October, November and December 1998, MARSHALL knew that Inso had not completed the US Airways deal and, accordingly, that Chan had not yet received any payment for signing the September 30, 1998 purchase order.

9

52.    In or about December 1998, for the purpose of persuading Chan to enter into additional deals in the fourth quarter (such as the OEM deal and the proposed Inso Australia deal), MARSHALL arranged to cause Inso to pay Chan the $160,000 that Chan expected as his payment for signing the September 30, 1998 purchase order.

53.    In or about December 1998, MARSHALL developed a plan to cause Inso to authorize payment to Chan of $160,000 by preparing forged and fraudulent documents, which falsely reflected an agreement by one of Chan's companies to perform software development work for Inso. In reality, as MARSHALL well knew, there was no such agreement.

54.    In or about December 1998, in order to obtain authorization for the $160,000 payment to Chan, MARSHALL provided to Inso's Chief Financial Officer ("CFO") a fraudulent "proof of concept" contract document, which described software development work purportedly performed by Chan's company, "Hong Hong Documents."

55.    On or about December 30-31, 1998, MARSHALL falsely informed Inso's CFO that Chan's company had performed the software development work to his satisfaction, and that an engineer in MARSHALL's group was satisfied with the work. In reality, as MARSHALL well knew, no such work had been performed.

56.    On or about December 30-31, 1998, in response to requests for further documentation to support payment of $160,000 for software development work, MARSHALL provided a letter agreement which falsely stated that Inso owed $160,000 to Hong Hong Documents for software development work. That letter agreement, which was signed by MARSHALL, contained a forgery of Chan's signature, as well as a forged "fax" header that purported to reflect transmission of the document from Chan's office in Malaysia.

57.     On or about December 31, 1998, Inso wire transferred $160,000 to Chan's bank accounts in Singapore and Malaysia.

## HILL Travels to Malaysia

58.     On or about December 28 through 31, 1998, defendant HILL traveled to Malaysia in order to meet with Chan, for the purpose of persuading Chan: (a) to immediately pay Inso for the September 30, 1998, "purchase order"; (b) to enter into a new software licensing agreement, the "OEM deal,"; and (c) to enter into a deal to purchase Inso Australia.

59.     On or about December 28 through 31, 1998, Chan communicated to defendant HILL that he did not believe he was obligated to pay for the September 30, 1998 purchase order.

60.     On or about December 28 through 31, 1998, Chan told defendant HILL that if Inso wanted Chan to pay $3,000,000, Inso would have to supply Chan with a total of $4,000,000 in letters of credit from Inso's bank, which Chan could use to borrow money from his own bank.

61.     On or about December 28 through 31, 1998, Chan told defendant HILL that he would be willing to borrow money, using letters of credit from Inso as collateral, in order to pay Inso approximately $3,000,000 for the September 30, 1998, purchase order.

62.     On or about December 28 through 31, 1998, Chan told defendant HILL that Chan would keep any remaining funds from the $4,000,000 in letters of credit to cover Chan's interest expenses and bank fees associated with obtaining a bank loan for payment to Inso and to provide a profit to Chan.

63.     On or about December 30 and 31, 1998, HILL assured Chan that the requested letters of credit would be issued forthwith.

64. On or about December 30 and 31, 1998, HILL and other Inso managers arranged to have Inso's bank transmit letters of credit for approximately $4,000,000, via telex, to Chan's bank in Singapore.

65. On or about December 30 and 31, 1998, defendant HILL and Chan agreed to sign an "International Distributor Agreement" as a pretext for Inso's issuance of $4,000,000 in letters of credit.

66. On or about December 30 and 31, 1998, defendant HILL agreed that the "International Distributor Agreement" would be signed only by Chan, individually, and would not involve any of Chan's businesses.

67. On or about December 30 and 31, 1998, Chan agreed to give HILL a check, payable to Inso, in Malaysian currency in the amount of 11,552,000 Ringgits, an amount approximately equal to $3,000,000.

68. At the time defendant HILL received the check, on or about December 30 and 31, 1998, defendant HILL did not expect that the check would clear and anticipated that Chan would make actual payment for the September 30, 1998 purchase order by wire transfer, only after Chan's bank accepted letters of credit from Inso's bank.

69. On or about December 30 and 31, 1998, defendant HILL arranged to fax a copy of the check from Chan's offices in Malaysia to Inso's office in Boston, Massachusetts.

70. On or about December 30 and 31, 1998, Inso recorded payment of $3,000,000 for the September 30, 1998 purchase order.

71. On or about December 30 and 31, 1998, defendant HILL returned to Boston.

72. On or about December 31, 1998 through January 4, 1999, defendant HILL

presented Chan's check in Malaysian Ringgits to Inso's controller as payment for the September 30, 1998 purchase order.

73.    On or about January 4, 1999, Inso personnel presented Chan's check to Inso's bank for deposit in Inso's account.

74.    In or about January 1999, defendant HILL made, and caused others to make, arrangements for Chan to wire funds to Inso, in lieu of the amount purportedly paid by check.

### Obtaining the Letters of Credit

75.    On or about December 30 and 31, 1998, defendant HILL caused Inso employees to prepare documentation for Inso's bank in order to obtain the letters of credit, including a document which bore Hill's signature stamp, certifying that the decision to obtain the letters of credit had been approved by Inso's Board of Directors. In actuality, as defendant HILL well knew, the Board of Directors had not provided any such approval.

### Misleading Inso's Accountants Regarding the Chan Transactions

76.    Between in or about September 1998 and in or about January 1999, MARSHALL caused the falsification of Inso's books and records and knowingly circumvented Inso's system of required internal accounting controls by concealing material information regarding Inso's revenues and its obligations from employees of Inso's finance department who were responsible for maintaining Inso's books and records.

77.    Between in or about September 1998 and in or about January 1999, MARSHALL fraudulently concealed from Inso's finance department that in connection with the September 30, 1998 order, MARSHALL had provided oral assurances to Chan that he would not have to pay Inso.

13

78.    Between in or about September 1998 and in or about January 1999, MARSHALL fraudulently concealed from Inso's finance department that Chan had no intention of paying Inso for the September 30, 1998 purchase order, unless Inso re-sold the software in question to another buyer.

79.    Between in or about September 1998 and in or about January 1999, MARSHALL fraudulently concealed from Inso's finance department that in connection with Chan's September 30, 1998 order, MARSHALL had provided oral assurances to Chan that Chan would receive an immediate $160,000 payment.

80.    In or about December 1998, MARSHALL provided false information to Inso's CFO, in order to induce her to authorize payment of $160,000 to Chan.

81.    In or about December 1998, MARSHALL provided forged and fraudulent documents to Inso's CFO, in order to induce her to authorize payment of $160,000 to Chan.

82.    In or about December 1998, MARSHALL knowingly and intentionally assisted the efforts of senior Inso officials to induce Chan to enter into a sham arrangement intended to create the false appearance that Inso had been paid for the September 30, 1998 purchase order.

83.    In or about January 1999, defendant HILL met with Inso's outside auditors, during their year-end audit of Inso's books and records, to discuss Inso's fourth quarter transactions with Chan and his companies.

84.    In or about January 1999, Defendant HILL failed to disclose to Inso's auditors that the letters of credit and the "International Distributor Agreement" which defendant HILL had negotiated with Chan in December 1998 were related–in purpose and effect–to Chan's "payment" for the September 30, 1998, purchase order.

14

85.    In or about January 1999, defendant HILL falsely told Inso's outside auditors that the letters of credit were intended simply as support for guarantees in the "International Distributor Agreement" that Chan would obtain at least $2 million per year in net revenues during 1999 and 2000 (i.e., a total of $4 million). In actuality, as defendant HILL well knew, Chan had requested the letters of credit in order to finance Chan's payment for the September 30, 1998 purchase order. Further, as defendant HILL well knew, Chan had insisted upon Inso's providing the letters of credit as a condition of Chan's signing the "International Distributor Agreement."

International Wire Transfer of $3,000,000 from Chan

86.    On or about January 22, 1999, Inso and Chan's bank reached agreement on the terms for the $4 million in letters of credit and Inso forwarded final amendments to the letters of credit to Chan's bank in Singapore.

87.    On or about January 26, 1999, Chan caused his bank in Singapore to wire funds in the amount of $3,000,000 to Inso's bank in Massachusetts as "payment" for the September 30, 1998 purchase order.

## COUNT ONE

### (Fraud in Connection with Purchase or Sale of Securities)

88.    The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

89.    On various dates between in or about September 1998 and in or about January 1999, in the District of Massachusetts and elsewhere,

### GRAHAM JAMES MARSHALL, and

### BRUCE GORDON HILL

defendants herein, knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, did directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase or sale of a security in contravention of Rule 10b-5 (17 C.F.R. Section 240.10b-5) of the Rules and Regulations promulgated by the SEC by (a) employing devices, schemes and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit, in connection with the purchase and sale of securities.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) [Securities Exchange Act of 1934, Sections 10(b) and 32] and 17 C.F.R. §240.10b-5 [Exchange Act Rule 10b-5], and Title 18, United States Code, Section 2.

16

## COUNT TWO

### (Wire Fraud)

90.     The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

91.     On or about December 30 and 31, 1998, in the District of Massachusetts and elsewhere,

### GRAHAM JAMES MARSHALL,

defendant herein, having devised and intending to devise a scheme or artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings signs, signals and pictures for the purpose of executing such scheme and artifice, to wit, the facsimile transmission from Providence, Rhode Island, to Boston, Massachusetts, of a putative "letter agreement" dated December 28, 1998, which purported to reflect an agreement for Inso to pay $160,000 to Hong Hong Printing Company, and which reflected a forged signature of Chan Hong Saik.

All in violation of Title 18, United States Code, Sections 1343 and 2.

17

## COUNTS THREE - FOUR

### (Wire Fraud)

92.    The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

93.    On or about the following dates, in the district of Massachusetts and elsewhere,

### BRUCE GORDON HILL,

defendant herein, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, to wit:

| Count 3: | December 30-31, 1998 | Fax transmission from Penang, Malaysia, to Boston, Massachusetts depicting a check, in the amount of 11,552,000 Ringgits. |
| Count 4: | December 29-31, 1998 | Telephone conversations between BRUCE GORDON HILL, in Penang, Malaysia, and others known to the Grand Jury in Boston, Massachusetts, concerning arrangements for issuance of letters of credit. |

All in violation of Title 18, United States Code, Sections 1341 and 2.

18

## COUNT FIVE

### (Circumventing Internal Accounting Controls)

94.    The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

95.    On various dates between in or about September 1998 and in or about April 1999, in the District of Massachusetts and elsewhere,

### GRAHAM JAMES MARSHALL,

defendant herein, did knowingly and willfully circumvent and cause others to circumvent, and did fail to implement and cause others to fail to implement, a system of internal accounting controls and knowingly falsify books, records, and accounts described in Section 13(b)(2) of the Securities Exchange Act of 1934 [Title 15, United States Code, Section 78m(2)] by concealing from Inso's finance department personnel, including Inso's CFO, oral assurances he made to Chan on or about September 30, 1998, and by providing Inso's CFO forged and fraudulent documents and information concerning the payment of $160,000 to Chan on or about December 31, 1998.

All in violation of Title 15, United States Code, Section 78m(b)(5) and 78ff [Securities Exchange Act of 1934, Sections 13(b)(5) and 32], 17 C.F.R. §§240.13b2-1 and 240.13b2-2, and Title 18, United States Code, Section 2.

## COUNT SIX

(Material Omissions and False Statements by Corporate Officer to Accountant)

96.     The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

97.     In or about January 1999, in the district of Massachusetts and elsewhere,

### BRUCE GORDON HILL,

defendant herein, being an officer of an issuer of securities regulated under the Securities Exchange Act of 1934, to wit, Inso Corporation, did directly and indirectly falsify and cause to be falsified books, records and accounts of Inso Corporation, and did directly and indirectly, make and cause to be made materially false or misleading statements, and did omit to state, and caused another person to omit to state, material facts necessary in order to make such statements, in the light of the circumstances under which such statements were made, not misleading, to an accountant: (1) in connection with an audit or examination of the financial statements of the issuer required to be made pursuant to the rules and regulations of the Securities Exchange Commission under the Securities Exchange Act of 1934; and (2) in the preparation and filing of documents and reports required to be filed with the Securities Exchange Commission under the Securities Exchange Act of 1934.

All in violation of Title 15, United States Code, Section 78m(b)(5) and 78ff [Securities Exchange Act of 1934, Sections 13(b)(5) and 32], 17 C.F.R. §§240.13b2-1 and 240.13b2-2, and Title 18, United States Code, Section 2.

COUNT SEVEN

(Perjury)

98.     The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

99.     On or about August 23, 2000, in the District of Massachusetts and elsewhere,

GRAHAM JAMES MARSHALL,

defendant herein, having duly taken an oath before a competent tribunal, officer, and person, in a case in which a law of the United States authorized an oath to be administered, that he would testify, declare, depose, and certify truly, willfully and contrary to such oath stated material matters which he did not believe to be true, that is, GRAHAM JAMES MARSHALL, having been duly sworn by an official of the United States Securities and Exchange Commission, did testify as follows:

> Q     I'm handing you Exhibit 157 which is a letter from Hong Hong -- rather, it's a letter to Hong Hong Printing from you and it's signed by both you and Mr. Chan, is that right?
>
> A     Uh-huh.
>
> Q     That was a "yes", wasn't it?
>
> A     Yes.

In actuality, as GRAHAM JAMES MARSHALL well knew, the letter in question was a forgery which contained a photocopy of Chan's signature, taken from a previous letter that Chan had sent to MARSHALL.

And did further testify as follows:

> Q     Was the consulting arrangement that you entered with Mr. Chan simply a justification for paying him for the money due him under the US Air deal?

21

A    I certainly didn't feel so. I think it's -- you know, had the US Air deal gone through, he'd have ended up with $320,000 which I think everybody would have felt happy about. I think it was -- from the AIX perspective, it was very very good business to have him do it and from the US Air deal, you know, it wasn't my problem, I wasn't really worrying about that. I was looking forward to the EBX deal which seemed to me the -- you know, the only thing that I was really worried about, the historic thing was really the -- you know, was going to happen or not going to happen but I didn't feel any responsibility for that.

Q    Well, sitting here today --

A    Uh-huh.

Q    -- can you testify that the consulting arrangement with Mr. Chan was not simply justification for a payment to him that he had been looking for for many months for the US Air deal?

A    Yes, I can. The -- we absolutely discussed in detail the AIX port over a considerable period of time and we did discuss a consulting arrangement. You know, the events during those three months meant that -- you know, I think I pointed out that though I'm not sure that I shared the proof of concept in detail with him but events overtook it and he got beyond the need for proof of concept, he got to the position where he was comfortable that his engineering team could do the AIX port.

In actuality, as GRAHAM JAMES MARSHALL well knew, there was no consulting arrangement with Chan or his companies and Chan never agreed that he or his companies would perform any work to develop an AIX port. As GRAHAM JAMES MARSHALL well knew, he had fabricated evidence of such an arrangement in order to create a written justification for paying Chan $160,000 in connection with Chan's September 30, 1998 signing of a "purchase order" in connection with the US Airways deal.

And did further testify as follows:

Q    Can you think of a reason that Mr. Chan would understand that payment to have been for the US Air deal?

[COUNSEL FOR MARSHALL] Don't guess. He signed a
document saying it was not.

A [by MARSHALL]: Yeah, and I think the amounts were the
same, as we have said so he'd sent two different lots of payment
instructions. There was a lot of transactions going on at that time
and I can't speak for his frame of mind.

Q    Well, is there any reason that you know of that he would
say the only payment he received from Inso was for the US Air
deal?

[COUNSEL FOR MARSHALL] Don't guess.

A [by MARSHALL]: No, there's no -- I can't conjecture that.

Q    You can't think of any reason?

A    No.

In actuality, as GRAHAM JAMES MARSHALL well knew, the only $160,000 payment that

Chan expected from Inso was Chan's commission for signing the September 30, 1998 "purchase

order" in connection with the U.S. Airways deal. As GRAHAM JAMES MARSHALL well

knew, he had never discussed with Chan any arrangement to pay Chan or his companies for AIX

porting or any other software development work. As GRAHAM JAMES MARSHALL well

knew, he had fabricated evidence of such an arrangement in order to create a written justification

for paying Chan $160,000 in connection with Chan's September 30, 1998 signing of a "purchase

order" in connection with the US Airways deal.

All in violation of Title 18, United States Code, Section 1621.

23

## COUNT EIGHT

### (Perjury)

100.    The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this Indictment and further charges that:

101.    On or about September 6, 2000, in the District of Massachusetts and elsewhere,

### BRUCE GORDON HILL,

defendant herein, having duly taken an oath before a competent tribunal, officer, and person, in a case in which a law of the United States authorized an oath to be administered, that he would testify, declare, depose, and certify truly, willfully and contrary to such oath stated material matters which he did not believe to be true, that is, BRUCE GORDON HILL, having been duly sworn by an official of the United States Securities and Exchange Commission, did testify as follows:

> Q    Let me rephrase my question. I think I'm going to short-circuit the answer, if I may, and just ask you when you anticipated . . . that the wire was necessary to replace the check.
>
> A    At some point in January when the check had been presented and outstanding for some period of time, negotiations continued to resolve [sic] around the letters of credit. I began to have concerns about, A, the ability of the check to clear through the Malaysian banking system, the original issue raised by Hong Saik. And as time went by, whether -- in fact, irrespective of whether those were the reasons whether Hong Saik -- Hong Saik would manipulate the check process in order to ensure that payment was not made until the letters of credit were issued.

In actuality, as BRUCE GORDON HILL well knew, at or about the time he received the check, on or about December 30-31, 1998, he learned that the check was not intended as actual payment for the September 30 purchase order, but that a wire transfer of funds would be used for that

24

purpose. Further, as BRUCE GORDON HILL well knew, arrangements for a wire transfer commenced within less than one week after the check had been presented.

    All in violation of Title 18, United States Code, Section 1621.

## COUNT NINE
### (Perjury)

102.    The Grand Jury realleges and incorporates by reference paragraphs 1-87 of this

Indictment and further charges that:

103.    On or about, November 9, 2000, in the District of Massachusetts and elsewhere,

### BRUCE GORDON HILL,

defendant herein, having duly taken an oath before a competent tribunal, officer, and person, in a

case in which a law of the United States authorized an oath to be administered, that he would

testify, declare, depose, and certify truly, willfully and contrary to such oath stated material

matters which he did not believe to be true, that is, BRUCE GORDON HILL, having been duly

sworn by an official of the United States Securities and Exchange Commission, did testify as

follows:

Q    Did you instruct Mr. Levitt to prepare the documents that FleetBank would
need for the letters of credit?

A    I think what I said to Jon was, "You need to work with Betty to document
this transaction". My experience with banks has been that typically they use their
own form documentation so it would be more a question of him reviewing
documentation but yes, assisting in the preparation of documents for this
transaction.

Q    At some point in your conversations with Betty Savage and Jon Levitt, did
they inform you about some of the documentation that Fleet required?

A    I recall that there were discussions about ancillary documentation apart
from the letters of credit themselves and I believe it was around one of those
conversations that I said to Jon, "Whatever authorization approval you need from
me to facilitate these transactions, you have it".

* * *

Q    Did you tell him that whatever documents he could execute as assistant
secretary, he could go ahead and do so?

A       I think what I said to him was more general than that, it was probably -- the substance of it was, "Jon, whatever approval you need from me", you know -- I may have even have said to him, "Whatever documents you need to execute on my behalf, go ahead and do it".

Q       And did you tell him to use your signature stamp in order to do that?

A       I may well have done so, I don't specifically recall saying that but I may well have done so.

* * *

Q       When you talked to Mr. Levitt or Betty Savage about the documentation needed for the letters of credit with FleetBank, did either of them inform you that FleetBank required an opinion letter and a certificate of secretary?

A       I don't recall that they did.

Q       Did you instruct Jon Levitt to prepare an opinion of counsel letter for your signature?

A       I don't specifically recall that I did.

Q       Did you instruct him to prepare a certificate of secretary for his signature as assistant secretary?

A       I don't recall that I did, no.

Q       Does your answer mean that you don't know one way or another or that you think you did not?

A       I don't have a memory of any conversation of that type. The conversation I can remember is the conversation I've already described where I said to Jon, in effect, "If you need my approval, my authorization to", you know, "get any documents prepared or executed, you have it". I don't remember any specific conversation about what precisely those documents were other than that there was an actual, I believe, letter of credit sent to me and that maybe that I remember that 'cause I've seen it in these proceedings but that's a document that I do remember seeing and discussing.

Q       In conversations with Betty Savage or Jon Levitt, did either of them read, to you, a board resolution that was part of a certificate of secretary for FleetBank?

A       I don't recall that they did, that either of them did.

Q       Did they read, to you, a certificate of secretary?

27

A      I don't recall that they did.

Q      We, I believe, looked at a certificate of secretary the last time you were --

A      Yes.

Q      -- here, do you remember that?

A      Yes, I do.

* * *

Q      Let me hand you what was previously marked as Exhibit 177, which is the two documents which we looked at before when you were here. The first three pages is a letter to FleetBank and the last page is a certificate of secretary, do you agree with that?

A      Yes.

Q      And referring to the first three pages, the letter, did Jon Levitt or Betty Savage paraphrase and or read to you this letter?

* * *

Q      Why don't you answer whether they read it to you verbatim first?

A      I do not have a recollection that they read these documents to me.

Q      Did either of them paraphrase the first three pages of this Exhibit for you over the telephone while you were in Malaysia?

A      The memory I have is that Jon, in the context of one of the conversations I had, informed me that there were certain documents that would need to be executed and I believe that that's the extent of any paraphrasing I remember.

* * *

Q      Item one contains a board resolution --

A      Yes.

Q      -- do you see that?

A      Yes.

28

Q    Did anyone read that resolution to you verbatim over the telephone while you were in Malaysia?

A    Again, I don't have a memory that they did, I would say, obviously, what I said before, which is, I was operating, again, after a long trip without a lot of sleep but I don't have a memory that this document was read to me.

Q    Did Mr. Levitt tell you that he was not comfortable, signing his name to a certificate of secretary and had prepared it for your signature instead?

A    I do not recall that he did.

Q    Do you recall any document that Mr. Levitt said he was not prepared to sign relating to the letters of credit?

A    No, I do not recall, I do not have a recollection of any such document.

* * *

Q    Did you review any documentation that required your stamp or signature while you were in Malaysia?

A    I do not recall that I did. As I said, I received some documents by fax, one of which I think was the letter of credit and another document may have been a draft of the distribution agreement associated with the letters of credit but other than that, I don't recall any other documents were sent to me.

Q    Were any documents reviewed with you verbally over the telephone pertaining to the letters of credit?

A    I believe I had conversations with Jon and with Betty and possibly with both of them about both the distribution agreement and the letters of credit themselves.

Q    In those conversations, did you review any of the documentation with them?

A    Any documentation other than those two documents?

Q    Yes.

A    I don't recall that I did, no.

In actuality, as BRUCE GORDON HILL well knew, while he was in Malaysia in December 1998,

he had a telephone conversation with an Inso attorney who informed him that Inso's bank

29

## SENTENCING ALLEGATIONS

104.  With respect to Count 1 of the Indictment:

(a)  The loss caused by the offense and by acts and omissions that each defendant aided, abetted or willfully caused, that were reasonably foreseeable to each defendant and that were part of the same course of conduct and common scheme, was greater than $80,000,000, as described in U.S.S.G. §2F1.1(b)(1)(S).

(b)  the offense involved more than minimal planning, as described in U.S.S.G. §2F1.1(b)(2).

(c)  Defendant Hill abused a position of trust and used a special skill in a manner that significantly facilitated the commission and concealment of the offense, as described in U.S.S.G. §3B1.3.

(d)  Defendant Marshall abused a position of trust in a manner that significantly facilitated the commission and concealment of the offense, as described in U.S.S.G. §3B1.3.

(e)  Defendant Marshall willfully obstructed or impeded, and attempted to obstruct and impede, the administration of justice during the course of the investigation of the offense and the obstructive conduct related to the offense, as described in U.S.S.G. §3C1.1.

(f)  Defendant Hill willfully obstructed or impeded, and attempted to obstruct and impede, the administration of justice during the course of the investigation of the offense and the obstructive conduct related to the offense, as described in U.S.S.G. §3C1.1.

31

105.    With respect to Counts 2 and 5 of the Indictment:

(a)    The loss caused by the offense and by acts and omissions that defendant Marshall
       aided, abetted or willfully caused, that were reasonably foreseeable to him and that
       were part of the same course of conduct and common scheme, was greater than
       $80,000,000, as described in U.S.S.G. §2F1.1(b)(1)(S).

(b)    the offense involved more than minimal planning, as described in U.S.S.G.
       §2F1.1(b)(2).

(c)    Defendant Marshall abused a position of trust in a manner that significantly
       facilitated the commission and concealment of the offense, as described in
       U.S.S.G. §3B1.3.

(d)    Defendant Marshall willfully obstructed or impeded, and attempted to obstruct and
       impede, the administration of justice during the course of the investigation of the
       offense and the obstructive conduct related to the offense, as described in U.S.S.G.
       §3C1.1.

106.    With respect to Counts 3, 4 and 6 of the Indictment:

(a)    The loss caused by the offense and by acts and omissions that defendant Hill aided,
       abetted or willfully caused, that were reasonably foreseeable to him and that were
       part of the same course of conduct and common scheme, was greater than
       $80,000,000, as described in U.S.S.G. §2F1.1(b)(1)(S).

(b)    the offense involved more than minimal planning, as described in U.S.S.G.
       §2F1.1(b)(2).

(c)     Defendant Hill abused a position of trust and used a special skill in a manner that significantly facilitated the commission and concealment of the offense, as described in U.S.S.G. §3B1.3.

(d)     Defendant Hill willfully obstructed or impeded, and attempted to obstruct and impede, the administration of justice during the course of the investigation of the offense and the obstructive conduct related to the offense, as described in U.S.S.G. §3C1.1.

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
Assistant United States Attorney

DISTRICT OF MASSACHUSETTS          September 15, 2004

Returned into the District Court by the Grand Jurors and filed.

_____
Deputy Clerk

12:40 pm

JS 45 (5/97) - (Revised USAO MA 3/25/02)

## Criminal Case Cover Sheet                    U.S. District Court - District of Massachusetts

**Place of Offense:**                    Category No. II_____    **Investigating Agency** FBI_____

**City** Boston_____              Related Case Information:

**County** Suffolk_____           Superseding Ind./ Inf.   Indictment____    Case No.   03-cr-10344-DPW
                                         Same Defendant _____    New Defendant  x_____
                                         Magistrate Judge Case Number   _____
                                         Search Warrant Case Number   _____
                                         R 20/R 40 from District of   _____

**Defendant Information:**

Defendant Name   BRUCE GORDON HILL_____         Juvenile   ☐ Yes   ☒ No

Alias Name   _____

Address   88 Rutledge Road, Belmont, Massachusetts 02478_____

Birth date: **/*/1963    SS#: ***/**/3048    Sex: M    Race: White____    Nationality: US_____

**Defense Counsel if known:**   Richard M. Egbert, Esq._____    Address: 99 Summer Street_____
                                                                       Boston, MA 02110_____
Bar Number:   _____

**U.S. Attorney Information:**

AUSA   Paul G. Levenson_____         **Bar Number if applicable**   553946_____

Interpreter:   ☐ Yes   ☒ No         List language and/or dialect:   _____

Matter to be SEALED:   ☐ Yes   ☒ No

    ☐ Warrant Requested         ☒ Regular Process         ☐ In Custody

**Location Status:**

**Arrest Date:**   _____

☐ Already in Federal Custody as of _____ in _____ .
☐ Already in State Custody _____   ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by _____ on _____

**Charging Document:**   ☐ Complaint   ☐ Information   ☒ Indictment

**Total # of Counts:**   ☐ Petty _____   ☐ Misdemeanor _____   ☒ Felony   6

Continue on Page 2 for Entry of U.S.C. Citations

☒         I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
          accurately set forth above.

**Date:** September 14, 2004         Signature of AUSA: _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

District Court Case Number  (To be filled in by deputy clerk): _____

Name of Defendant    **BRUCE GORDON HILL** _____

## U.S.C. Citations

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| **Set 1** | 15 USC §§78j(b), 78ff | Securities Fraud | 1 |
| Set 2 | 18 USC §1343 | Wire Fraud | 3-4 |
| Set 3 | 15 USC §§78m(b)(5), 78ff | False Statements by Corp. Officer to Accountant | 6 |
| Set 4 | 18 USC §1621 | Perjury | 8-9 |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

js-45 superseding.wpd - 3/13/02

%JS 45 (5/97) - (Revised USAO MA 3/25/02)

**Criminal Case Cover Sheet** _____ **U.S. District Court - District of Massachusetts**

**Place of Offense:** _____ Category No. _II_____ Investigating Agency _FBI_____

**City** _Boston_____ Related Case Information:

**County** _Suffolk_____ Superseding Ind./ Inf. __Indictment____ Case No. __03-cr-10344-DPW___
Same Defendant _x_____ New Defendant _____
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name __GRAHAM JAMES MARSHALL_____ Juvenile ☐ Yes ☒ No

Alias Name _____

Address __No. 2 The Elms, Aveland Way, Aslackby, Sleaford Lincolnshire, NG340HG UNITED KINGDOM_

Birth date: _**/*/1947_ SS#: _***/**/****_ Sex: _M__ Race: _White_____ Nationality: _United Kingdom_

**Defense Counsel if known:** _____ Address: _____

**Bar Number:** _____ _____

**U.S. Attorney Information:**

**AUSA** _Paul G. Levenson_____ Bar Number if applicable _553946_____

**Interpreter:** ☐ Yes ☒ No   List language and/or dialect: _____

**Matter to be SEALED:** ☐ Yes ☒ No

☒ Warrant Requested   ☐ Regular Process   ☐ In Custody

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as of _____ in _____.
☐ Already in State Custody _____ ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:  Ordered by _____ on _____

**Charging Document:** ☐ Complaint   ☐ Information   ☒ Indictment

**Total # of Counts:** ☐ Petty _____ ☐ Misdemeanor _____ ☒ Felony _4_____

Continue on Page 2 for Entry of U.S.C. Citations

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
accurately set forth above.

**Date:** September 14, 2004   Signature of AUSA: _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

District Court Case Number (To be filled in by deputy clerk): _____

Name of Defendant    __GRAHAM JAMES MARSHALL_____

U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  15 USC §§78j(b), 78ff | Securities Fraud | 1 |
| Set 2  18 USC §1343 | Wire fraud | 2 |
| Set 3  15 USC §§78m(b)(5), 78ff | Circumventing internal accounting controls | 5 |
| Set 4  18 USC §1621 | Perjury | 7 |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

ADDITIONAL INFORMATION: _____

_____

_____

js-45 no 3.wpd - 3/13/02