UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> v. ) <br> ) <br> RICHARD P. VATCHER, ) <br> ) <br> Defendant. ) <br> _____ ) | CRIMINAL NO. **03CR 10270 RCL** <br> VIOLATIONS: <br><br> 15 U.S.C. §78j(b) and 78ff; 17 C.F.R. §240.10b-5 <br> (fraud in connection with purchase or sale of security) <br><br> 15 U.S.C. §78m(a) and 78ff; 17 C.F.R. §§240.13a-13, 240.13b2-2 and 240.12b-20 (false reports to SEC) <br><br> 18 U.S.C. §2 (aiding and abetting) |

### INFORMATION

The United States Attorney Charges that, at times pertinent to this Information:

1. Richard P. Vatcher (Vatcher), was an individual who resided at Framingham, in the District of Massachusetts.

2. Beginning in or about August 1997 and continuing until on or about March 1999, Vatcher was Vice President for International sales of Inso Corporation, Inc. ("Inso").

3. In addition to his base salary, Vatcher's employment agreement with Inso provided for quarterly bonuses based on whether the International sales group under his leadership met or exceeded quarterly revenue goals.

4. Inso was a Delaware corporation with its headquarters in Boston, Massachusetts, and with offices and/or sales representatives worldwide.

5. Inso was a corporation whose stock was publicly traded.

6. Inso was in the business of developing, producing and supplying software used in the sharing and publishing of electronic information.

7. Inso's common stock was traded on the NASDAQ National Market System and registered with the United States Securities and Exchange Commission pursuant to Section 12(g) of the Securities Exchange Act of 1934.

8. Inso derived revenue primarily from the sale of software licenses, from software maintenance fees, and from royalties received in connection with license arrangements with resellers.

9. As required for a publicly traded company subject to the Securities Exchange Act of 1934, Inso routinely reported the financial results of its operations, including its revenues, in quarterly and annual reports to the Securities Exchange Commission and to the public.

10. Inso's board of directors, in consultation with management, set quarterly and annual revenue goals for the company.

11. Inso's management also set revenue goals for Inso's sales managers, including Vatcher.

12. In or about early 1998, Inso adopted as its revenue recognition policy Statement of Position 97-2 ("SOP 97-2"), entitled "Software Revenue Recognition," as amended, issued by the American Institute of Certified Public Accountants. SOP 97-2 requires the following in order to recognize revenue: (a) persuasive evidence of an arrangement exists; (b) delivery has occurred; (c) the vendor's fee is fixed or determinable; and (d) collectibility is probable. SOP 97-2 also requires consideration of "informal communications, or other factors [that] indicate that payment is substantially contingent on [a] reseller's success in distributing...the product."

13. Defendant Vatcher was generally aware of Inso's policies and requirements for revenue recognition.

2

## The Revenue Recognition Fraud Scheme

14. On multiple occasions in or about 1998, Vatcher made, and caused others to make, false and misleading reports that he and others in his International sales group had completed certain agreements, totaling more than $3.6 million, for the sale of Inso products (the "phony sales").

15. As Vatcher well knew and understood, these false and misleading reports directly caused Inso to record in its books and records, and to report to the SEC and the public, revenue attributable to phony sales.

16. In connection with the phony sales, Vatcher had provided customers with side-agreements, which gave the customers the right to cancel or modify those sales.

17. As Vatcher well knew and understood, these side-agreements–had they been disclosed–would have precluded Inso from recognizing and reporting revenue from the phony sales under Inso's revenue recognition policy, as outlined in SOP 97-2.

18. Vatcher deliberately concealed, and caused others to conceal, the side-agreements from Inso's finance department, which was responsible for making revenue recognition decisions. Vatcher did so with the intention of causing Inso to recognize revenue for the phony sales.

19. On various occasions in or about 1998 and in or about January 1999, Vatcher knowingly provided false and misleading information, and knowingly provided falsified documents, to members of Inso's finance department in order to conceal the existence of side-agreements he had granted to customers.

3

20. As a result of Vatcher's actions, Inso's reports to the public in press releases and in its filings with the SEC included revenues that did not conform with Generally Accepted Accounting Principles ("GAAP") for the recognition of revenue.

A. <u>Fraudulent Revenue Recognition, First Quarter 1998</u>

21. As set forth below, in or about the March 1998, Vatcher arranged a phony sales transaction in order to fraudulently boost Inso's reported revenue from Vatcher's International sales group for the first quarter of 1998 (January through March).

i. <u>Toshiba Advanced Systems, Inc. (March 1998)</u>

22. At times pertinent to this Information, Toshiba Advanced Systems Corp. ("Toshiba Advanced") was a Japanese company that distributed Inso software in Japan.

23. In or about March 1998, Vatcher requested Toshiba Advanced to provide him with a purchase order for Inso products that Vatcher anticipated would be sold to end-user customers during the following quarter. Vatcher agreed that Toshiba Advanced would only have to pay for the products when, and if, end-user customers actually agreed to buy them.

24. As requested by Vatcher, on or about March 31, 1998, Toshiba Advanced provided Vatcher with a purchase order for $485,760 of Inso products. On the fax cover sheet that accompanied the purchase order, Toshiba Advanced inserted the word "temporary" next to the purchase order number, indicating that Toshiba Advanced did not expect to be bound by the terms of the purchase order, unless end-user customers actually purchased the products.

25. Vatcher intentionally failed to disclose to Inso's finance department that Toshiba Advanced did not consider its purchase order to be a final and binding order and that Vatcher had agreed the order would be contingent on the anticipated sale of the software to another company.

4

26. In or about March 31, 1998, when an employee of Inso's finance department asked Vatcher why the word "temporary" appeared on the fax containing the Toshiba Advanced purchase order, Vatcher falsely told the employee that the word temporary referred to the numbering of the purchase order, not to the order itself.

27. As Vatcher well knew, under Inso's revenue recognition policy, the March 1998 Toshiba Advanced order could not properly be recorded as revenue to Inso, since any "purchase" by Toshiba Advanced was contingent on the hoped-for future sale of the software to end-user customers.

28. As a result of Vatcher's actions, in the first quarter of 1998, Inso improperly recognized approximately $422,000 in revenue from the phony sale of $485,760 to Toshiba Advanced.

  ii. Reporting of Financial Results (First Quarter 1998)

29. On or about April 22, 1998, Inso issued a press release announcing that revenues for the quarter ended March 31, 1998, totaled $17.6 million.

30. On or about May 15, 1998, Inso filed its quarterly financial report to the SEC, Form 10-Q, which reflected first quarter revenues of approximately $17.6 million.

31. As Vatcher well knew, the $17.6 million figure reported in Inso's press release and in its Form 10-Q for the first quarter of 1998 was fraudulently inflated by approximately $422,000, due to the recognition of revenue from the phony sale to Toshiba Advanced.

 B. Fraudulent Revenue Recognition, Second Quarter 1998

32. In or about June 1998, Vatcher arranged phony sales transactions in order to fraudulently boost Inso's reported revenue from Vatcher's International sales group for the

second quarter of 1998 (April through June). Second quarter phony sales transactions included the following:

    i.    <u>Toshiba Advanced Systems, Inc. (June 1998)</u>

33. In or about June 1998, Vatcher again requested Toshiba Advanced to provide him with a purchase order for Inso products that Vatcher anticipated would be sold to an end-user customer during the following quarter. Vatcher again agreed that Toshiba Advanced would only have to pay for the products if and when an end-user customer actually agreed to buy them. By e-mail, Vatcher assured Toshiba Advanced that he, Vatcher, would cancel the Toshiba Advanced order on or before July 15, 1998.

34. As requested by Vatcher, on or about June 30, 1998, Toshiba Advanced provided Vatcher with a purchase order for $1,132,704 of software licenses and maintenance from Inso.

35. Vatcher intentionally failed to disclose to Inso's finance department that he had agreed that the June 1998 Toshiba Advanced order would be contingent on the anticipated sale of the software to another company. When Inso's collections group later sought payment for this transaction, Toshiba Advanced refused to pay.

36. As Vatcher well knew, under Inso's revenue recognition policy and under GAAP, the June 1998 Toshiba Advanced order could not properly be recorded as revenue to Inso, since any "purchase" by Toshiba Advanced was contingent on the hoped-for future sale of the software to another customer.

37. As a result of Vatcher's actions, in the second quarter of 1998, Inso improperly recognized approximately $989,000 in revenue from the phony sale of $1,132,704 to Toshiba Advanced.

ii. <u>Software Distribution International</u>

38. At times pertinent to this Information, Software Distribution International ("SDI") was a French software company that had purchased Inso products and services.

39. In or about June 1998, Vatcher requested SDI to act as a distributor and place a $300,000 order before the close of Inso's second quarter. Vatcher told SDI that he anticipated completing a $300,000 sale to another French software company early in the following quarter and assured SDI that SDI's order would become effective only upon SDI's receipt of the other company's order.

40. As requested by Vatcher, on or about June 30, 1998, SDI placed an order with Inso for $300,000, which Vatcher provided to Inso's finance department.

41. Vatcher intentionally failed to disclose to Inso's finance department that he had agreed that the sale to SDI would be contingent on the anticipated sale of the software to another company.

42. On or about July 28, 1998, SDI learned that the other French software company did not intend to place an order, and SDI canceled its purchase.

43. Vatcher intentionally failed to disclose to Inso's finance department that SDI had canceled its purchase.

44. In or about mid-September 1998, when Inso attempted to collect payment for the order, an SDI employee stated that the order had been canceled in July. When Inso's controller questioned Vatcher about SDI's cancellation of the order, Vatcher falsely stated that he had allowed SDI to cancel its purchase.

7

45. As Vatcher well knew, under Inso's revenue recognition policy and under GAAP, the SDI order could not properly be recorded as revenue to Inso, since any "purchase" by SDI was contingent on the hoped-for future sale of the software to another customer.

46. As a result of Vatcher's actions, in the second quarter of 1998, Inso improperly recognized approximately $261,000 in revenue from the phony sale of $300,000 to SDI.

  iii.  Hermes Precisa Pty. Ltd.

47. At times pertinent to this Information, Hermes Precisa Pty. Ltd. ("Hermes") was an Australian software reseller that distributed Inso products in Australia.

48. In or about June 1998, the Australian Army had a license for Inso software that was due to expire at the end of that month. As of late June, the Australian Army had not finalized a contract to extend the license.

49. In or about June 1998, Vatcher directed an Inso sales representative in Australia to obtain a purchase order from Hermes for a $350,000 software license to be resold to the Australian Army.

50. As requested by Vatcher, on or about June 29, 1998, Hermes provided the Inso sales representative with a purchase order for the $350,000 software license. The purchase order stated on its face that the order was conditional upon the signing of a software license contract with the Australian Army.

51. On or about June 30, 1998, Vatcher provided to Inso's finance department a fraudulently altered copy of the purchase order, from which he had deleted the language conditioning Hermes' purchase on the signing of a contract with the Australian Army.

8

52. As Vatcher well knew, under Inso's revenue recognition policy and under GAAP, the Hermes' order could not properly be recorded as revenue to Inso, since any "purchase" by Hermes' was contingent on the hoped-for future contract to re-license Inso software to the Australian Army.

53. As a result of Vatcher's actions, in the second quarter of 1998, Inso improperly recognized approximately $350,000 in revenue from the phony sale to Hermes.

  ii. <u>Reporting of Financial Results (Second Quarter 1998)</u>

54. On or about July 16, 1998, Inso issued a press release announcing that revenues for the quarter ended June 30, 1998 totaled $16,213,000.

55. On or about August 15, 1998, Inso filed its quarterly financial report to the SEC, Form 10-Q, which reflected second quarter revenues of approximately $16,213,000.

56. As Vatcher well knew, the $16,213,000 figure reported in Inso's press release and in its Form 10-Q for the second quarter of 1998 was fraudulently inflated by approximately $1,700,000, due to the recognition of revenue from phony sales, including the June 1998 transactions involving Toshiba Advanced, SDI and Hermes.

 C. <u>Fraudulent Revenue Recognition, Third Quarter 1998</u>

57. In or about the September 1998, Vatcher arranged phony sales transactions in order to fraudulently boost Inso's reported revenue from Vatcher's International sales group for the third quarter of 1998 (July through September). Third quarter phony sales transactions included the following:

  i. <u>The Research Group</u>

58. At times pertinent to this Information, The Research Group ("TRG") was a small software reseller that distributed Inso products in England.

59. During 1998, members of Inso's sales team attempted to negotiate a large sale to a British company known to the U.S. Attorney (referred to here as the "British Company").

60. On or about the last day of the third quarter, September 30, 1998, a sales manager under Vatcher's supervision reported to Vatcher that he had reached an agreement in principle for a three-year license arrangement with the British Company, valued at approximately $1.1 million. The sales manager told Vatcher he expected the deal would be completed within 2 to 6 weeks.

61. In order to fraudulently record revenue in the third quarter of 1998 for the anticipated future license agreement with the British Company, Vatcher instructed a sales representative in Inso's London office to obtain a purchase order for $1.1 million from TRG.

62. On or about September 30, 1998, Vatcher arranged to provide TRG with a faxed side letter, stating that he, Vatcher, would cancel the purchase order from TRG if the British Company failed to complete a contract with Inso by November 1998.

63. As Vatcher had requested, on or about September 30, 1998, TRG issued a purchase order for $1.1 million for Inso software licenses, to be re-sold to the British Company.

64. Vatcher intentionally failed to disclose to Inso's finance department the existence of the side letter that had been provided to TRG and instructed the Inso sales representative who had delivered that letter to destroy his copy.

65. As Vatcher well knew, under Inso's revenue recognition policy and under GAAP, the order from TRG could not properly be recorded as revenue to Inso, since any "purchase" by TRG was contingent on the hoped-for future sale of the software licenses to another customer.

10

66. As a result of Vatcher's actions, in the second quarter of 1998, Inso improperly recognized approximately $935,000 in revenue from the phony sale of $1.1 million to TRG.

    ii.   <u>MediaGold France</u>

67. At times pertinent to this Information, MediaGold France ("MediaGold") was a French software reseller that had purchased Inso products and services.

68. In or about September 1998, Vatcher instructed an Inso sales representative to ask MediaGold to sign a $400,000 sales contract by the end of the quarter.

69. In order to obtain the sales contract, Vatcher caused Inso's sales representative to provide MediaGold with a side letter stating that MediaGold could cancel the sale within seven days after the date of "purchase."

70. As requested by Vatcher, on or about September 30, 1998, MediaGold signed a contract for the purchase of $400,000 of Inso software licenses and maintenance.

71. Vatcher intentionally failed to disclose to Inso's finance department the existence of the side letter that had been provided to MediaGold.

72. As Vatcher well knew, under Inso's revenue recognition policy and under GAAP, the order from MediaGold could not properly be recorded as revenue to Inso, since any "purchase" by MediaGold was subject to cancellation.

73. As a result of Vatcher's actions, in the second quarter of 1998, Inso improperly recognized approximately $394,000 in revenue from the phony sale of $400,000 of software licenses and maintenance to MediaGold.

    iii.   <u>Reporting of Financial Results (Third Quarter 1998)</u>

11

74. On or about October 15, 1998, Inso issued a press release announcing that revenues for the quarter ended September 30, 1998 totaled $18,707,000.

75. On or about November 16, 1998, Inso filed its quarterly financial report to the SEC, Form 10-Q, which reflected third quarter revenues of approximately $18,707,000.

76. As Vatcher well knew, the $18,707,000 figure reported in Inso's press release and in its Form 10-Q for the third quarter of 1998 was fraudulently inflated by approximately $1,500,000 due to the recognition of revenue from phony sales, including the September 1998 transactions involving TRG and MediaGold.

## COUNT ONE

(Fraud in Connection with Purchase or Sale of Securities)

77. The United States Attorney realleges and incorporates by reference paragraphs 1-76 of this Information, and further charges that:

78. On various dates between March 1998 and January 1999, in the District of Massachusetts and elsewhere,

### RICHARD P. VATCHER,

defendant herein, knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, did directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of a security in contravention of Rule 10b-5 (17 C.F.R. Section 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission by (a) employing devices, schemes and artifices to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit, in connection with the purchase and sale of securities, that is shares of Inso Corporation, by causing the dissemination in the marketplace of false financial information that fraudulently inflated Inso Corporation's revenues from sales during 1998.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) and 17 C.F.R. §240.10b-5, and Title 18, United States Code, Section 2.

## COUNTS TWO THROUGH FIVE

(False Filings with the SEC)

79. The United States Attorney realleges and incorporates by reference paragraphs 1-76 of this Information, and further charges that:

80. On or about the dates set forth below, in the District of Massachusetts and elsewhere,

## RICHARD P. VATCHER,

defendant herein, unlawfully, willfully and knowingly made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, and willfully and knowingly omitted to state, and caused others to omit to state, material facts necessary in order to make the statements made, in light of the circumstances, not misleading, to wit, Inso Corporation's filings, which included financial statements that failed to conform with Generally Accepted Accounting Principles as required by Regulation S-X (17 C.F.R. § 210.1-01, et seq.) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and which reflected fraudulently inflated revenues attributable to phony sales that Vatcher had intentionally caused to be recorded and recognized:

| COUNT | FILING | DATE FILED |
|---|---|---|
| 2 | Form 10-Q for Inso Corporation, 1st Quarter 1998 | May 15, 1998 |
| 3 | Form 10-Q for Inso Corporation, 2d Quarter 1998 | August 15, 1998 |
| 4 | Form 10-Q for Inso Corporation, 3d Quarter 1998 | November 16, 1998 |

| 5 | Form S-3 for Inso Corporation Stock Offering | December, 18, 1998 |

All in violation of Title 15, United States Code, Section 78m(a) and 78ff; 17 C.F.R. §§240.13a-13, 240.13b2-2 and 240.12b-20; and Title 18, United States Code, Section 2.

15

                                                    Respectfully submitted,

                                                    MICHAEL J. SULLIVAN
dated: August 11, 2003                     United States Attorney

                                                    By: /s/ Paul G. Levenson
                                                    PAUL G. LEVENSON
                                                    Assistant U.S. Attorney
                                                    John Joseph Moakley United States Courthouse
                                                    1 Courthouse Way, Suite 9200
                                                    Boston, MA 02210
                                                    (617) 748-3147