UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 03-10344-DPW |
| | ) | |
| BRUCE GORDON HILL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

UNITED STATES' TRIAL MEMORANDUM

The United States of America, by its undersigned counsel, submits this memorandum in order to advise the Court and defense counsel regarding anticipated evidence at trail.

OFFENSES CHARGED

The superseding indictment charges both defendants with two securities fraud offenses, wire fraud and perjury.  Securities Fraud (15 U.S.C. §78j(b) and 78ff; 17 C.F.R. §240.10b-5); Wire Fraud (18 U.S.C. §1343);  Material Omissions and False Statements by Corporate Officer to Accountant (15 U.S.C. §78m(b)(5) and 78 ff,17 CF.R. §§240.13b2-1 and 240.13b2-2); and Perjury (18 U.S.C. §1621).

Hill is the former Secretary, Vice President and General Counsel of Inso Corporation, Inc. ("Inso"), a now-defunct seller of electronic publishing software.  As described in the Indictment, in the closing hours of the 3d quarter of 1998, Hill prepared the paperwork for a transaction whereby Chan Hong Saik, the owner of a Malaysian software company, provided Inso with a purchase order for $3,040,000 in anticipation of an expected upcoming sale of software to U.S. Airways.  This putative sale represented over 15% of Inso's reported Q3 revenues and enabled Inso to meet internal and public targets for revenue growth.

At the end of the fourth quarter of 1998, when Inso's hoped-for software sale to U.S. Airways had failed to materialize, Hill played the key role in the company's efforts to cover up the phony purchase order and to pay off Chan. Hill arranged to provide Chan with $4,000,000 in Letters of Credit from Inso's bank into order to induce Chan to wire $3,000,000 to Inso, purportedly as payment for the September 30 purchase order. The arrangements which Hill put in place enabled Inso to record substantial revenues from Chan, while concealing that Inso was effectively paying Chan $4,000,000 at the same time.

The perjury charges against Hill arise from Hill's testimony when he was questioned in the course of an SEC investigation into Inso's inflated 1998 revenue reports and subsequent public re-statement of revenue in February 1999. Hill testified at length regarding the dealings between Inso and Chan. As set forth in the Indictment, in his testimony Hill falsely described his own knowledge about the Chan deals and understated his role in arranging for corporate documentation to support the issuance of the letters of credit that Inso provided to Chan.

<u>ELEMENTS OF THE OFFENSES</u>

A.    <u>Securities Fraud – 15 U.S.C. §§78j(b) and 78ff, 17 C.F.R. §240.10b-5</u>

1.    <u>Statute and Rule</u>

Section 10(b) prohibits, <u>inter alia</u>, the use, "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any *manipulative or deceptive device or contrivance* in contravention of such rules and regulations as the Commission may prescribe...." (emphasis added). Rule 10b-5 defines "manipulative or deceptive device" as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artifice to defraud;
(b) to make any untrue statement of a material fact necessary in order to make the
statements made, in the light of the circumstances in which they were made, not
misleading; or
(c) to engage in any act, practice, or course of business which operates or would
operate as a fraud or deceit upon any person;
in connection with the purchase or sale of shares of any security.

17 C.F.R. § 240.10b-5.  Section 32(a) of the Securities and Exchange Act imposes criminal

penalties for "willful" violations of the Act. 15 U.S.C. § 78ff(a).

> 2.     Elements Summarized

A conviction for securities fraud requires proof of the following elements:

1.     In connection with the [purchase or] sale of securities, the defendant
       employed a device, scheme, or artifice to defraud;

2.     the defendant made use of or caused the use of any means or
       instrumentality of interstate commerce or the mails; and

3.     The defendant acted with the intent to defraud.

2 Devitt, Blackmar, & O'Malley, Federal Jury Practice & Instructions, §§52.05-52.07, p. 839-

842 (4th Ed. 1990).

> 3.     Elements Discussed

Employment of a device, scheme, or artifice to defraud.  The recognition of revenue on

incomplete sales transactions, if material, violates Rule 10b-5.  A "company that 'substantially

overstate[s] its revenues by reporting consignment transactions as sales ... mak[es] false or

misleading statements of material fact.'"  In Re Worlds of Wonder Sec. Litig., 35 F.3d 1407,

1418 (9th Cir. 1994), quoting Malone v. Microdyne Corp., 26 F.3d 471, 478 (4th Cir. 1994);

Cooper v. Pickett, 122 F.3d 1186 (9th Cir. 1997).  A falsification of publicly reported financial

information is "material" within the meaning of Section 10(b) "if a reasonable investor would

have viewed the misrepresentation or omission as 'having significantly altered the total mix of

information made available.'" <u>Gross v. Summa Four, Inc.</u>, 93 F.3d 987 (1st Cir. 1996) <u>quoting</u> <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 225 (1988).

In this case, Hill violated all three prongs of Rule 10b-5: he engaged in a scheme to defraud, he made false statements of material fact, and he engaged in a course of business that operated as a fraud or deceit on investors. While others, notably Graham Marshall, initiatedthe September 30 deal, Hill orchestrated an elaborate cover-up to disguise the nature of Inso's dealings with Mr. Chan. By concocting a sham distribution contract, with guarantees "backed" by$4,000,000 in letters of credit, Hill arranged for Inso to pay for its own receivable from the September 30 purchase order, and thus concealed the fact that Inso's publicly announced revenues for the third quarter were overstated.

<u>In connection with the purchase or sale of securities</u>. A defendant who was not directly involved with the sale of a security is liable if he "knowingly and actively participated in a fraudulent scheme which resulted in the offer or sale." <u>United States v. Mayo</u>, 646 F.2d 369, 371 (9th Cir. 1981). The United States need only show "that the fraudulent conduct 'touches' the purchase or sale of the securities." <u>Id.</u> (citations omitted). In a somewhat different context, the Supreme Court recently noted, with respect to the term "in connection with the purchase and sale of a security," that because Congress' objective was "to insure honest securities markets and thereby promote investor confidence . . . the statute should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." <u>Securities and Exchange Comm.</u> <u>v. Zandford</u>, 122 S. Ct. 1899, 1903 (2002) (citations omitted).

<u>Use of a means or instrumentality of interstate commerce or the facilities of a National</u> <u>Securities Exchange.</u> To the extent that the jurisdictional element in the securities fraud offense, rests on proof of the use of a means or instrumentality of interstate commerce, the requirement is

less demanding than that of the mail or wire fraud statutes.   With respect to a 10b-5 prosecution, "intrastate use of . . . [an] interstate means of communication [or] any other interstate instrumentality" is sufficient to establish federal criminal jurisdiction.  15 U.S.C. § 78c(a)(17); see United States v. Charnay, 537 F.2d 341, 345 (9th Cir. 1976) (intrastate use of telephone was sufficient to constitute a use of an instrumentality of interstate commerce); United States v. Kunzman, 54 F.3d 1522, 1525 (10th Cir. 1995) (deposits in banks involved in interstate commerce and travel are sufficient).   The United States anticipates that the evidence will show that Hill made phone calls, and sent faxes and e-mails from Boston to Malaysia and vice versa, and ultimately traveled to Malaysia, all in furtherance of the scheme to defraud.

Scienter.  This securities fraud prosecution also requires a showing of scienter – the intention to deceive, manipulate, or defraud.  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976).[1]  An act is done "willfully" if it is done intentionally and deliberately and not as a result of innocent mistake, negligence, or inadvertence.  United States v. Dixon, 536 F.2d 1388, 1397 (2d Cir. 1976).  While the United States need not prove specific intent to violate the securities laws, the evidence must support a finding that the defendant intended to commit the act prohibited.  United States v. Schwartz, 464 F.2d 499, 509 (2d Cir. 1972).  In United States v. Faulhaber, 929 F.2d 16, 19 (1st Cir. 1991), the First Circuit has upheld the use, in the context of a securities fraud charge, of a jury instruction on scienter based on the instruction in United States v. Bank of New England, N.A., 821 F.2d 844, 855-56 (1st Cir. 1987).  In Bank of New England the instruction was as follows:

> "Knowingly simply means voluntarily and intentionally. It's designed to exclude a failure that is done by mistake or accident, or for some other innocent reason.

---

[1]    "Manipulation" is "virtually a term of art" that refers to certain activity on securities markets not relevant to this case.  See Santa Fe Indus. v. Green, 430 U.S. 462, 476 (1977).

> Willfully means voluntarily, intentionally, and with a specific intent to disregard, to disobey the law, with a bad purpose to violate the law."

Bank of New England, N.A., 821 F.2d at 855-56.

Through his own testimony before the SEC, through the testimony of Chan, and through the testimony of other former Inso officers, the United States will show that Hill's conduct was willful. Among other things, the United States will show that Hill had a strong motive for his actions, that he knew the transactions in question were shams, that he caused false representations to be made in corporate board minutes in order to further his scheme, and that he concealed pertinent facts from Inso personnel, and from outside auditors, and ultimately from the SEC.

B.     Wire Fraud – 18 U.S.C. §1343

1.     Statute

18 U.S.C. §1343 provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both. . . .

18 U.S.C. §1343.

2.     Elements Summarized

The United States must prove the following elements to sustain a wire fraud charge:

(1)     That there was a scheme, substantially as charged in the indictment, to defraud or to obtain money or property by means of false or fraudulent pretenses regarding a material fact;

(2)     That the defendant knowingly and willfully participated in that scheme with the intent to defraud; and

(3)     That the defendant used, or caused the use of, interstate wire communications, on or about the dates alleged, in furtherance of the scheme.

Pattern Jury Instructions of the First Circuit, Criminal, Instruction No. 4.13 (1998); Neder v. United States, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").

        3.     Elements Discussed

Fraud.  The basic definition of a fraud scheme, which is the same for mail or wire fraud, is well settled.  As the First Circuit's pattern jury instructions state:

> A scheme includes any plan, pattern or course of action. The term "defraud" means to deprive another of something of value by means of deception or cheating. A scheme to defraud is ordinarily accompanied by a desire or purpose to bring about some gain or benefit to oneself or some other person or by a desire or purpose to cause some loss to some person. It includes a scheme to deprive another of the intangible right of honest services.

> The term "false or fraudulent pretenses" means any false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth and that were made with the intent to defraud. They include actual, direct false statements as well as half-truths and the knowing concealment of facts.

> A "material" fact or matter is one that has a natural tendency to influence or be capable of influencing the decisionmaker to whom it was addressed.

Pattern Jury Instructions of the First Circuit, Criminal, Instruction No. 4.13 (1998).

Intent.  The intent standards for mail and wire fraud are also familiar:

> [Defendant] acted "knowingly" if he . . . was conscious and aware of his. . . actions, realized what he . .  was doing or what was happening around him . . . and did not act because of ignorance, mistake or accident.

> An act or failure to act is "willful" if done voluntarily and intentionally, and with the specific intent to do something the law forbids, or with specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or to disregard the law.

> To act with "intent to defraud" means to act willfully and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another or bringing about some financial gain to oneself.

Pattern Jury Instructions of the First Circuit, Criminal, Instruction No. 4.13.

Interstate Wire Communications.  "Interstate wire communications" include telephone and fax communications across state or national boundaries.  In Count Two, the Indictment specifies the fax transmission of a check that Chan provided to Hill in Malaysia at the end of December 1998.  Hill faxed this check to Inso's accountants – in order to create the appearance that Chan had paid for the September 30 purchase order – even though, by Hill's own account, Chan had told Hill, "I'm not saying it will clear" as he handed him the check.  Count Three of the Indictment specifies Hill's use of the telephone in Malaysia –  calling his colleagues in Boston to arrange for the issuance of letters of credit to Chan – and directing them to prepare a document with Hill's signature stamp which falsely stated that Inso's directors had approved the letter of credit transaction.

    C.     False Statements to Accountants – 15 U.S.C. §§78m(b)(5) and 78ff, 17 C.F.R. §§240.13b2-1 and 240.13b2-2

        1.     Statute/Rules

Section 13(b)(5) of the Securities Exchange Act of 1934 provides:

> No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account [required to be maintained by issuers of securities].

15 U.S.C. §§78m(b)(5). The implementing regulations under this section include Rules 13b2-2

and 13b2-1. Rule 13b2-1 provides:

> No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act.

Rule 13b2-2 provides, in pertinent part:

> (a) No director or officer of an issuer shall, directly or indirectly:
>
>> (1)    Make or cause to be made a materially false or misleading statement to an accountant in connection with; or
>>
>> (2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:
>>
>>> (i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or
>>>
>>> (ii) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

17 C.F.R. §240.13b2-2.

> The penalty provisions of the Securities Exchange Act of 1934 include the following:
>
>> Any person who willfully violates any provision of this chapter . . . or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter . . .[shall be guilty of an offense].

15 U.S.C. §78ff.

2.     <u>Elements Summarized</u>

The elements of this offense are:

1.     The Defendant was an officer or director of an issuer;

2.     The Defendant caused the falsification of the books and records of Inso or circumvented its accounting controls by:

     (a)     making a false statement or

     (b)     omitting to inform accountants of a material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading;

3.     The Defendant's false statements and/or omissions were in connection with:

     (a) an audit, review or examination of Inso's financial statements; or

     (b) The preparation or filing of Inso's financial statements; and

4.     The defendant acted willfully.

3.     <u>Elements Discussed</u>

The charge against Hill stems from his communications with with Inso's outside accountants, auditors from Ernst & Young, who were attempting to sort out the accounting treatment of the various Chan transactions.  As Secretary of the Inso Corporation, Hill was an officer of an issuer of a publicly traded security.  The United States will show that, in written submissions and face-to-face encounters with the Ernst & Young auditors, Hill failed to disclose any connection between the letters of credit and accompanying "International Distributor Agreement," which defendant Hill had negotiated with Chan in December 1998, and Chan's "payment" for the September 30 purchase order.  The willfulness of such omissions is shown by the circumstances of the communications –  the auditors were expressly inquiring about the

purpose and effect of the contracts at issue – and by Hill's considerable efforts to conceal and

misrepresent the facts at issue.

      E.      Perjury – 18 U.S.C. § 1621

          1.      Statute

The Perjury statute provides in pertinent part:

> Whoever–
> (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true . . .   is guilty of perjury.

18 U.S.C. §1621.

          2.      Elements Summarized

The elements of the perjury offense are as follows:

(1)      The defendant gave testimony under oath;

(2)      that the defendant's testimony was as described in the indictment;

(3)      that this testimony was false;

(4)      defendant knew that his testimony was false;

(5)      defendant gave this testimony willingly and contrary to his oath; and

(6)      the false testimony was material; and

(7)      defendant testified under an oath administered by a qualified person in a proceeding for which a law of the United States authorizes the administration of an oath.

Kevin F. O'Malley, Jay E. Grenig, Hon. William C. Lee,  2A Federal Jury Practice and

Instructions, §50.03 (5th ed. 2000).

          3.      Elements Discussed

Intent.  To testify "willfully and contrary to such oath" means to voluntarily and deliberately give false testimony intending to avoid the known legal duty to testify truthfully. Kevin F. O'Malley, Jay E. Grenig, Hon. William C. Lee,  2A Federal Jury Practice and Instructions, §50.04 (5th ed. 2000).  A witness testifying under oath or affirmation violates Section 1621 if he gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory.  United States v. Dunnigan, 507 U.S. 87, 94 (1993).

Materiality.  The materiality element is broadly interpreted under the perjury statute: In United States v. Pandozzi, the First Circuit wrote:

> A statement is material if "it is 'capable of influencing the tribunal' " as to "any proper matter of the [grand] jury's inquiry," United States v. Scivola, 766 F.2d 37, 44 (1st Cir.1985) (quoting United States v. Giarratano, 622 F.2d 153, 156 (5th Cir.1980)), that is, if it 'might have influenced the grand jury' or 'impeded or hampered' its inquiry, United States v. Goguen, 723 F.2d 1012, 1019 (1st Cir.1983).

878 F.2d 1526, 1532-1533 (1st Cir.1989).  No proof of actual reliance or actual impeding is required.  The perjury statutes were "enacted in an effort to keep the course of justice free from the pollution of perjury."  United States v. Williams, 341 U.S. 58, 68 (1951).  As such Section 1621 "is not directed so much at ... (the effects of perjury) as at its perpetration; at the probable wrong done the administration of justice by false testimony."  Williams, 341 U.S. at 68.  The SEC is expressly authorized to administer oaths in connection with its investigations pursuant to Section 21(b) of the Securities Exchange Act (15 U.S.C. §78u(b)).

Count Eight charges Hill with lying in his response to a question about when he (Hill) realized that a wire transfer–rather than Chan's Malaysian check–would be needed to effect payment for the September 30 purchase order.  Hill's answer was that he started to have

12

misgivings about the check, "when the check had been presented and outstanding for some period of time, negotiations continued to resolve around the letters of credit." The evidence will show that in actuality Hill knew from the outset that the check was not intended as a bona fide payment.      Count Nine charges Hill with lying about the circumstances under which his colleague, Jonathan Levitt, prepared documentation for Inso's bank in order to obtain the letters of credit for Chan. Hill testified that he was not aware of the precisely what documents Levitt prepared and did not specifically authorize Levitt to use Hill's signature stamp on a certificate that (falsely) stated that Inso's board of directors had approved the issuance of the letters.

Aiding and Abetting

To establish "aiding and abetting" under Title 18, United States Code, Section 2, the United States the United States must prove that Hill "associated himself " with the venture that led Inso falsely to report revenue in its 10-Q in November 1998 and that perpetuated and concealed the falsity of this report through January 1999 and "that he sought actions to make this illegal act succeed." United States v. Colon-Munoz, 192 F.3d 210, 224 (1st Cir. 1999).


UNITED STATES' THEORY OF THE CASE

On the evening of the last day of the third quarter of 1998, after trying for over six months to close a major software deal with US Airways, Inso booked approximately $3,000,000 for the sale of the US Airways software to a Malaysian company controlled by Chan Hong Saik (Chan). Chan was a business acquaintance of Graham Marshall, the manager of the Inso division responsible for the US Airways software. Chan agreed to sign a purchase order for the software (the "Third Quarter Transaction"), with the understanding that Chan would resell the software to US Airways when the expected US Airways deal came through. Neither Chan nor

13

Marshall expected that Chan or his company would actually pay for the deal. By booking this $3 million sale on September 30, 1998, Inso was able to meet its revenue targets for the third quarter of 1998 and thus protect its stock price (which had declined precipitously in the past, when Inso's earning reports fell below analysts' expectations).

Notwithstanding the Inso managers' hopes on September 30, the US Airways deal did not close in the following days or weeks. As the year drew to a close, Hill and other Inso personnel scrambled to find some way to avoid disclosing the fact that Inso had booked $3,000,000 in revenue, attributable to the "sale" to Chan, but had no real prospect of collecting payment from Chan (who had no use for the software in question).

At the end of 1998, Hill and other Inso personnel put together a sham multi-year distribution arrangement with Chan to circumvent the problem. The agreement served as a mechanism to enable Chan to pay for Inso's $3,000,000 receivable arising out of the Third Quarter Transaction. Under this arrangement, Inso provided Chan with unconditional Letters of Credit worth $4,000,000, which enabled Chan to borrow sufficient funds to make the payment. Chan's payment – funded entirely by Letters of Credit that Inso provided – enabled Inso to avoid restating or writing-off the third quarter revenue it had booked.

On December 30 Chan handed Hill a check denominated in Malaysian currency for the equivalent of $3,000,000, but made clear that any actual payment of the $3,000,000 would depend upon Chan's bank's actual acceptance of Inso's letters of credit. Notwithstanding Chan's warning that the check would not clear, Hill faxed a copy of the check to Inso as proof of payment. On his return to the United States, Hill provided the check to Inso's controller for deposit without alerting the controller of Chan's warning that the check was no good. Inso's bookkeepers posted Chan's December 30 check as payment for the Q3 purchase order. Chan

14

ultimately wired Inso $3,000,000 in late January 1999, after Chan's Singapore bank had

accepted the Inso letters of credit as collateral for a line of credit upon which that bank advanced

$3,000,000.

Beginning in early January, an audit team from Ernst & Young began their year-end audit

of Inso. The auditors sought more detailed information from Hill on the Chan transaction. In

face to face meetings and in writing, Hill failed to disclose any connection between the Letters of

Credit and Chan's payment for the Q3 purchase order.

In late January 1999, upon the discovery of irregularities in other 1998 transactions, Inso

hired outside counsel to conduct an internal investigation. Based on the results of the internal

investigation, Inso announced that it would have to restate its reported 1998 revenues. The

reversed transactions included approximately a dozen transactions, totaling approximately

$7,000,000, of which roughly $2,800,000 was attributable to the Third Quarter "sale" to Chan.

In the ensuing SEC investigation, Hill testified at length about his dealings with Chan. In

that testimony he acknowledged that Chan had requested the Letters of Credit in order to help

finance various obligations, including the Third Quarter purchase order. This was a disclosure

that Hill had not made to Inso's auditors during their year-end audit. During the SEC

investigation Hill was asked, in particular, about the mechanics of the preparation of Inso's

corporate authorization for the letters of credit. Hill claimed that he had broadly delegated this

task to his colleague, Jonathan Levitt, and that he was only generally aware of the steps Levitt

took to arrange for the letters of credit. This testimony was directly contrary to Hill's prior

statements to Inso's outside counsel during the company's internal investigation. Hill's also

testified that he only gradually came to suspect that Chan's check was not intended as payment

for the September 30 purchase order.

<u>ANTICIPATED TESTIMONY</u>

The United States anticipates calling the following witnesses:

1.      <u>Jonathan Levitt</u>, former general counsel of Inso.  At the time of the events at issue, Levitt was an attorney working in the legal department at Inso.  Levitt had responsibility for, among other things, drafting contracts, including the proposed contract with U.S. Airways. Levitt will describe his dealings with Bruce Hill in connection with the preparation of the Letters of Credit that were issued in December 1998 and January 1999.

2.      <u>Vincent Parrett</u>, was formerly an associate at the former Hale and Dorr law firm. Parrett took notes and prepared a memorandum of interviews of Hill in connection with the internal investigation at Inso in February and March 1999.

3.      <u>Cyntha Garron</u>, is a paralegal at the former Hale and Dorr law firm, who supervised the production of documents to the SEC in connection with its investigation of Inso, and who subsequently supervised the production of additional documents (including Vincent Parrett's memorandum and notes) to the United States Attorney's Office.

4.      <u>Steven Frankel</u>, is a securities analyst with Adams, Harkness & Hill, who covered Inso for that firm during the period at issue, issuing periodical reports and recommendations regarding the valuation of Inso's stock.

5.      <u>Doug Belair</u>, is a former employee of General Dynamics Corporation.  Belair will testify that he received a telephone call from Marshall on September 30, 1998, in which Marshall requested that General Dynamics serve as an Inso "distributor" for the U.S. Airways deal.  Belair will testify that he refused Marshall's request.

6.      <u>Paul Savage</u>, was Inso's Vice President of Worldwide Sales and Service.  In that role, Savage was responsible for predicting Inso's sales for each quarter.  Savage participated in

the discussions – with Hill and others in Inso's senior management – regarding the deals with Mr. Chan's companies at the close of the third and fourth quarters of 1998.

7.    <u>Richard Vatcher</u>, was a Vice President of International Sales at Inso from August 1997 through January 1999. Vatcher, has pled guilty to securities fraud charges arising from multiple transactions in which Inso improperly recognized revenue on "sales" to third-party distributors. Vatcher helped originate the idea of using future business prospects associated with Inso's Australian subsidiary as part of a deal with Mr. Chan, as a means of satisfying the September 30, 1998 receivable.

8.    <u>Mark Schueppert</u>, is a former in-house lawyer at Inso. Schueppert will testify regarding his familiarity with the Chan deals, including his efforts to prepare paperwork for a proposed deal whereby Mr. Chan would purchase Inso's Australian subsidiary.

9.    <u>Steven Paxhia</u>, is a former CEO of Inso. Paxhia will testify as to the internal and external goals that Inso aimed to meet in the third and fourth quarters of 1998, and his dealings with Hill and others in connection with their dealings with Mr. Chan.

10.    <u>Betty Savage</u>, is a former CFO of Inso. Savage will testify that she notified Hill and other senior Inso management that Inso needed to receive payment on the September 30, 1998 receivable before it could recognize revenue on any subsequent deal with Chan. Savage will also describe her dealings with Hill with regard to Hill's efforts to collect $3 million dollars from Chan at the end of 1998 and with regard to the preparation of Letters of Credit.

11.    <u>Patricia Ann Michaels</u>, is a former Inso controller. Michaels will testify regarding her dealings with Hill with regard to the receipt of a check from Mr. Chan in late December 1998. Michaels will also describe her participation in conversations between Hill and Inso's outside auditors in January 1998.

17

12.     <u>Jeanne McKenna</u>, is a former sales representative at Inso.  McKenna will testify about her efforts to negotiate an OEM licensing agreement with Chan during the fall of 1998. She will also describe what she heard and saw when she accompanied Hill on his visit to Chan's offices in Malaysia in the last two days of December 1998.

13.     <u>Andrew Vrigian</u>, is a audit partner of Ernst & Young LLP.  As a member of the team that audited Inso, Vrigian will testify about his review of the Chan deals and his discussions with Hill regarding the facts and circumstances of those deals.

14.     <u>Matthew Shedd</u>, is a former partner of Ernst & Young LLP and part of the team that audited Inso.  Shedd will testify regarding his review of the Chan transactions and his meeting with Hill in January 1999.

15.     <u>Chan Hong Saik</u>, is a businessman in Penang, Malaysia and principal of Hong Hong Printing and Hong Hong Corporation, privately owned businesses in Malaysia.  Chan will testify about his dealings with Inso Corporation, including the representations Graham Marshall made to him when Marshall first asked Chan to sign a "purchase order" on September 30, 1998. Chan will describe his dealings with Bruce Hill in late December 1998 and the subsequent winding-up of his affairs with Inso.

POTENTIAL EVIDENTIARY ISSUES

<u>Admissibility of Statements In Furtherance of the Fraud</u>

The Indictment charges that defendant Hill and others made a variety of false and fraudulent representations in executing a fraud scheme.  In several important respects, multi-member fraud schemes, of the kind charged here, are treated in much the same way as conspiracies.  See <u>United States v. Yefsky</u>, 994 F.2d 885, 893 (1st Cir. 1993) ("A multi-member

18

mail fraud is itself treated like a conspiracy.") (citing United States v. Serrano, 870 F.2d 1, 6 (1st

Cir.1989) and United States v. Wormick, 709 F.2d 454, 461 (7th Cir.1983)).

Specifically, the United States anticipates the evidence will show that defendant Hill and

co-conspirators Graham Marshall and Richard Vatcher each played separate roles in pursuing the

evolving fraud scheme that began with the overstatement of Inso's revenues during the third

quarter of 1998 and continued with the construction of an elaborate fabric of sham transactions

designed to cover up the initial overstatement.  Hill, Marshall, and Vatcher, in concert and

individually, took steps to prevent public disclosure of the fact that Inso had announced revenue

figures for the third quarter of 1998 that included roughly $3 million in "sales" to Chan, upon

which Inso had no serious prospect of collecting payment.

Hill, Marshall, and Vatcher each acted with the shared goal of preventing disclosure of

the fact that Inso's reported third quarter revenues were inflated by approximately one-sixth,

based on the inclusion of the $3 million "sale" to Chan.  All three work desperately to stave off

one disaster that threatened to catch them from behind - Inso's over-optimistic recording of

revenue in the third quarter on the hope that U.S. Air would soon buy a large package of Inso

software – and one that loomed ahead – the imminent failure to meet Inso's revenue targets for

the fourth quarter of 1998.

In furtherance of the fraud, Hill, Marshall and Vatcher repeatedly consulted one another

in concocting a series of sham transactions involving Mr. Chan and his Malaysia-based

companies in the fourth quarter of 1998.  Vatcher proposed to Marshall and Hill the concept of

selling to Chan Inso's Pacific Rim operations (Inso Australia) in order to provide Chan with a

sufficient pipeline of customers to entice him to pay the $3 million.  Marshall proposed to Hill a

purported $160,000 software development contract with Chan as sleight-of-hand a way to pay

Chan the $160,000 commission that Marshall had promised Chan when he signed the September 30 1998 purchase order.

In these efforts all three, Hill, Marshall and Vatcher, made statements in furtherance of the fraud scheme alleged in the Indictment. The United States does not offer such statements "for the truth of the matter asserted." On the contrary, the United States contends that these statements were false and fraudulent. Rather, such statements are verbal acts; the making of these statements was an act of fraud. Indeed, some of these statements are among the key misrepresentations underlying the scheme to defraud. See United States v. Calvert, 523 F.2d 895, 907 (8th Cir. 1975) ("[S]tatements were 'verbal acts' made in furtherance of the fraudulent scheme and were admissible on that ground.") (citing VI Wigmore on Evidence §1766 at 177-180 (3d ed. 1940)).

To the extent that any of Marshall's statements during the course of the scheme may be offered by the United States for the truth of the matter asserted, they are properly admitted pursuant to Fed. R. Evid. 801(d)(2)(E). That the defendants have not been charged with the crime of conspiracy does not vitiate the application of Rule 801(d)(2)(E). See Fed. R. Evid. (Advisory Committee note to 1974 Enactment) (rule carries forward "the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged."). As noted above, a multi-member fraud scheme is treated essentially as a conspiracy. See Yefsky, 994 F.2d at 893.

In assessing the admissibility of any statements offered under Rule 801(d)(2)(E), it will be for the Court to determine whether the evidence shows, by a preponderance of evidence, the existence of a conspiracy and the participation therein of both the declarant and the party against whom the statement is offered. See generally Bourjaily v. United States, 483 U.S. 171 (1987).

This standard does not require a showing that the defendant was himself a member of the conspiracy at the time the statement was made, so long as he later joined that conspiracy.  United States v. Goldberg, 105 F.3d 770, 775-76 (1st Cir. 1997) (reaffirming "the traditional notion that--insofar as hearsay is concerned--a late-joining conspirator takes the conspiracy as he finds it: 'a conspiracy is like a train,' and 'when a party steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight....'") (quoting United States v. Baines, 812 F.2d 41, 42 (1st Cir.1987)).  See also United States v. Saccoccia, 58 F.3d 754, 778 (1st Cir.1995).  The First Circuit has suggested that such statements may be admitted provisionally, subject to the Court's ultimate ruling on whether the United States has satisfactorily established, by a preponderance, both the existence of a conspiracy and the fact that the statement at issue was in furtherance of such conspiracy.  See United States v. Petrozziello, 548 F.2d 20, 23 n.3 (1st Cir. 1977), abrogation on other grounds noted in Goldberg, 105 F.3d at 775-76.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

dated:  April 27, 2005

By: /s/ Paul G. Levenson
PAUL G. LEVENSON
Assistant U.S. Attorney
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3147