UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

No.  03-10344-DPW

UNITED STATES OF AMERICA

v.

BRUCE GORDON HILL

**DEFENDANT BRUCE HILL'S SENTENCING MEMORANDUM**

Defendant Bruce Gordon Hill respectfully submits this Sentencing Memorandum to

aid this Court in his sentencing, scheduled for January 24, 2006.

I.    **BACKGROUND**

Hill has been living under the shadow of this case for nearly 7 years, since the

Security and Exchange Commission ("SEC") began its investigation on February 1,

1999.  He was not indicted[1] until more than five years after the investigation began, on

May 5, 2004, when he was charged in six counts with fraud in connection with the

purchase or sale of securities, wire fraud, material omissions and false statements by a

corporate officer to an accountant, and two counts of perjury.

Hill was arraigned on May 12, 2004.  At that time, the Court released him on his

own recognizance.  The Court also entrusted Hill to travel, unrestricted, throughout the

---

[1] The grand jury issued a Second Superseding Indictment on September 15, 2004.  The
only difference between that at the Superseding Indictment was the addition of
sentencing allegations, added in response to Blakely.

continental United States, and to travel abroad so long as he obtained the permission of Pretrial Services.

After 18 days of trial, followed by protracted deliberations, the jury was able to reach a verdict on only one of the counts, perjury (count 9). More specifically, the jury found that Hill lied under oath about his involvement in obtaining certain documentation related to the issuance of letters of credit. The jury was unable to reach an agreement on the fraud counts, the material misrepresentation to an accountant count, or the other perjury count.

After negotiations, Hill and the prosecution executed a Sentencing Agreement. In exchange for Hill agreeing to an amount of potential loss and giving up certain rights, the prosecution agreed to dismiss the remaining counts. As to the Sentencing Guidelines, the parties agreed (and the PSR concurs) that the Total Offense Level is 20:

- Base Offense Level of 6 under § 2F1.1(a);

- + 16 under § 2F1.1(b)(1)(C) for a loss of $20,000,000 to $40,000,00;

- +2 under § 2F1.1(b)(2)(A) for more than minimal planning/more than one victim;

- +2 under § 3B1.3 for abuse of trust/use of a special skill;

- -6 under § 2X3.1

- Total Offense Level 20

With a criminal history category of I, the corresponding Guideline range is 33-41 months.

For the reasons that follow, Hill respectfully requests that this Court sentence him to a term of house arrest for one year. In support of his request, Hill asks this Court to depart downward from the advisory Guideline sentence because: (1) the loss figure overstates the seriousness of his offense, and (2) his conduct was aberrant. In addition, in

light of the factors set forth in 18 U.S.C. § 3553(a), as well as additional relevant factors, the requested sentence is appropriate and reasonable.

## II.    THIS COURT SHOULD DEPART DOWNWARD BECAUSE THE LOSS OVERSTATES THE SERIOUSNESS OF HILL'S OFFENSE

In the Sentencing Agreement, the parties agreed that, pursuant to U.S.S.G. § 2F1.1(b)(1)(C), the amount of the potential loss was greater than $20,000,000 but less than $40,000,000.   Hill also, however, reserved the right to argue that the agreed-upon loss overstates the seriousness of his perjury offense.  For this reason and the more particular reasons set forth below, Hill respectfully requests that this Court grant his request for a downward departure from the advisory Guidelines.  See Application Notes to U.S.S.G. § 2F1.1 (2000)("In a few instances, the loss determined under (b)(1) may overstate the seriousness of the offense…  In such cases, a downward departure may be warranted.")

### A.  Hill Exposed The Fraudulent Transactions.

As a starting point, the loss overstates the seriousness of Hill's offense because, as the undisputed evidence at trial showed, it was Hill himself who started the internal investigation that uncovered a series of fraudulent deals, mostly orchestrated by Vice President of International Sales, Richard Vatcher.  See United States v. Arutunoff, 1 F.3d 1113, 1120 (10th Cir.)(upholding district court's decision to apply downward departure where, inter alia, defendant acted to expose fraud), cert. denied, 510 U.S. 1017 (1993).

The investigation had its genesis at the very beginning of 1999, when Hill discovered that Vatcher had engineered a fraudulent "sale" of Inso product so that he would not miss his sales target.  During the second quarter, two salesmen in a division headed by Vatcher had been negotiating a deal with Unilever.  They were not able close

the deal by the end of the third quarter of 1998 and when Vatcher learned this, he brought in a distributor, The Research Group. But, unbeknownst to anyone else at Inso, Vatcher had made a side deal: he told The Research Group that it would not be responsible for the order unless and until Inso closed the deal with Unilever. Had Vatcher disclosed that side agreement, Inso could not have properly recognized revenue from the transaction in that quarter.

A few months later, Vatcher approached Jonathon Levitt, one of Inso's in-house attorneys, and told him that The Research Group wanted to assign away its rights and obligations under the purchase order to another company. Levitt drafted the assignment papers, which he, in turn, gave to Hill for his review and approval. Hill instructed Levitt that, while The Research Group could make the assignment, it could not assign its liability to Inso.

When he learned that Hill would not permit The Research Group to be relieved of its liability to Inso, Vatcher admitted to Hill that he had made a side agreement. In response to Vatcher's admission, Hill began the investigation and learned that Vatcher's fraud was pervasive. Vatcher was suspended and eventually fired. That same day, Hill brought in outside counsel to conduct the investigation, and, within days, outside counsel notified the SEC of the side agreements.

On February 1, 1999, the SEC began its lengthy and comprehensive investigation. During that investigation, the SEC deposed Hill for three days, totaling nearly 18 hours and hundreds of pages of transcript. The SEC investigation ultimately led to the prosecution of Vatcher, Marshall and Hill. But other members of Inso's upper management that were involved in the events surrounding the September 30, 1998

purchase order – such as CEO Steven Vana-Paxhia, Vice President of Sales Paul Savage, and CFO Betty Savage – received immunity or 'no target' letters.

Because he acted to expose the fraudulent recording of revenue, holding Hill accountable for the entire amount of the potential loss would overstate the seriousness of his perjury offense.  Indeed, without Hill's investigation, none of the improper revenue recognitions would have been uncovered.  Hill's actions leading to the discovery of the many fraudulent transactions was laudable; nary has a defendant accused of fraud actually started the investigation that leads to his prosecution.  Using the heightened loss Guideline to fashion a just and reasonable sentence would no doubt overstate the seriousness of Hill's perjury.

### B.  The Loss Overstates the Seriousness of Hill's Offense Because He Was Convicted of Perjury, Not Fraud.

The thrust of the prosecution's theory was that, after the transaction was recorded, Hill concocted a way to cover up the fraudulent reporting of the September 30, 1998 purchase order.  According to the prosecution, Hill did not actually negotiate the written distribution agreement with Chan – that was a phony deal, the prosecution theorized, designed only to funnel Chan the resources (i.e., the letters of credit) to pay for the purchase order.  The prosecution also alleged that Hill did not tell Inso's auditors about the true reasons for the letters of credit, and that he lied on two occasions in his deposition.

The prosecution, however, was unable to prove the vast majority of its case and Hill was convicted of only a single count:  perjury.  On the third day of Hill's deposition testimony before the SEC, in the fall of 2000, an SEC attorney asked Hill about a Certificate of Secretary issued in connection with the letters of credit.  Hill testified,

falsely, that his signature may have been on the document because he gave Inso attorney Jonathon Levitt the general authority to use his signature stamp as it might be needed, and that he did not learn of the Certificate of Secretary until after the investigation began.

Although he was convicted only of perjury, after negotiating with the prosecution, Hill agreed that there was a loss to the market of between $20,000,000 and $40,000,000. As such, the Guidelines instruct the Court to adjust his base offense level of 6 upward by 16 levels under U.S.S.G. § 2F1.1(b)(1)(C). Applying the relevant Guidelines leads to a Total Offense Level of 20, with a corresponding sentencing range of 33 to 41 months.

But using the amount of loss to determine a reasonable sentence overstates the seriousness of his offense. Indeed, the perjury's connection to the fraud – the reporting of revenue in the third quarter of 1998 – is rather tenuous. The connection is as follows: Marshall allegedly made a side deal with Chan, telling Chan he did not have to pay unless Inso completed the sale to US Airways; the revenue from the purchase order was incorrectly recognized during the third quarter of 1998; Hill negotiated the letters of credit, which Chan used as collateral to borrow funds used to pay for the September 30, 1998 purchase order; Hill was convicted for lying about his role in the drafting of the letters of credit; and when Inso publicly announced that the revenues for the third quarter of 1998 had been overstated, Inso shares fell in value for a period of time, thereby creating a loss to the market.

Hill no doubt committed a serious offense. Importantly, however, Hill's perjured testimony did *not* cause the false reporting of revenue (unlike Vatcher), it did *not* further any fraud, and it did *not* cause a loss to any victim. It did not even hamper the SEC

investigation.  As such, he should be punished in a manner consonant with the way other defendants guilty of perjury are punished.

The base offense level for perjury is 12.  <u>See</u> U.S.S.G. § 2J1.3 (2000).  With a criminal history category of I, Hill would face a Guideline sentence range of 10 to 16 months.  The difference between a Guideline sentence for perjury versus a Guideline sentence for fraud is substantial:  *it is the difference of up to 31 months*.  Viewed against this backdrop, it is clear that the amount of the loss overstates the seriousness of Hill's conviction.

### C.  None of the Deals Hill Negotiated with Chan Resulted in the Improper Recognition or Restatement of Revenue.

As the PSR describes, and as this Court may recall from trial, Inso's upper management instructed Hill to cut short his holiday vacation and travel to Malaysia during the last days of 1998.  Before he left, CEO Vana-Paxhia gave him a very specific set of marching orders:  (1) to obtain payment from Chan for the September 30, 1998 purchase order; (2) to close the OEM deal for $2,600,000; and (3) to negotiate and close a distribution agreement.  Even though he told CEO Steven Vana-Paxhia that the goals "were not do-able," Hill defied his own expectations and accomplished each objective.

First, he obtained a check in the amount of 11,552,000 Ringats, an amount equivalent to $3,040,000, the amount of that Hong Hong Corporation owed under the September 30, 1998 purchase order.  Hill's accomplishment of this goal, however, did not cause any loss -- by that time, the purchase order had already been recorded as revenue and Inso had already publicly announced its revenues for the third quarter of 1998.

Second, Hill and salesperson Jean McKenna closed the OEM deal. It was uncontested at trial that the OEM agreement – by all accounts, a <u>bona</u> <u>fide</u> transaction -- did not contribute to any loss.

Third, Hill successfully negotiated a distribution agreement. To guarantee his profits under the distribution agreement, Chan insisted that Inso provide him with letters of credit totaling $4,000,000. The letters of credit were ultimately issued in January, 1999. But the related distribution agreement was never recorded as revenue. In other words, it did not cause any loss.

### D.  Hill Did Not Make Any Misrepresentations that Led to the Improper Recording of Revenue.

The amount of the loss further overstates the seriousness of Hill's offense because, unlike Vatcher, Hill did not make any misrepresentations or side deals that led to the improper recording of revenue. Indeed, the record is devoid of evidence that Hill, unlike CEO Vana-Paxhia and Vice-President Savage, had any involvement in the decision to bring a distributor into the US Airways deal at the last minute. The record is likewise devoid of evidence that Hill (unlike Vatcher) knew that Graham Marshall, Vice President of Inso's Electronic Publishing division,[3] had entered into a side deal with Chan, or that he had any other reason to believe that the transaction was not a <u>bona</u> <u>fide</u> one.

Because Hill is not accountable for any misrepresentations that led to the potential loss, the loss figure overstates the seriousness of his perjury offense. <u>See Arutunoff</u>, 1

---

[3] Inso's CEO, Steven Vana-Paxhia, and Vice President of Sales, Paul Savage, were the ones who decided to bring a distributor into the US Airways deal.

F.3d at 1120 (upholding downward departure where, <u>inter</u> <u>alia</u>, defendant did not make any "out and out misrepresentations that led to loss").

### E.  Much of the Loss is Attributable to Other Sources.

This Court should also consider that much of the loss is attributable to extraneous causes.

The loss table in U.S.S.G. § 2F1.1 presumes that Hill is responsible for the entirety of the loss.  <u>See</u> <u>United States v. Gregorio</u>, 956 F.2d 341, 346 (1st Cir. 1992). But, where unrelated factors affect the amount of loss -- as is true in Hill's case -- a sentencing court may grant a downward departure.  <u>See</u>, <u>e.g.</u>, <u>United States v. Maldonado-Montalvo</u>, 356 F.3d 65, 69 (1st Cir. 2003).  ("The Guidelines nevertheless permit a downward departure where the total loss calculation overstates the seriousness of the offense…. [L]loss overstatement may occur where, <u>inter</u> <u>alia</u>, any portion of the total loss sustained by the victims is a consequence of factors extraneous to the defendant's criminal conduct."); <u>United States v. Reeder</u>, 170 F.3d 93, 109 (1st Cir. 1999)("whatever distortive effects extraneous causes may have had on the total `victim loss' calculation may warrant a departure from the applicable guideline sentencing range."), <u>cert.</u> <u>denied</u>, 528 U.S. 872 (1999).  As to the degree of the departure, "the structure and dimension of  the departure [are left] to the reasoned discretion of the sentencing court."  <u>Gregorio</u>, <u>supra</u>. at 348.

### 1.  Richard Vatcher Caused Much of the Loss.

Here, much of the loss is attributable not to Hill, but to former Inso Vice President of International Sales, Richard Vatcher.  To be sure, Vatcher was responsible for more than two-thirds of the $7,000,000 in restated revenue.

According to the Information to which Vatcher pled guilty, on multiple occasions in 1998, Vatcher made, and caused others to make, false and misleading reports that he and others in Vatcher's International Sales group had sold millions of dollars of Inso product. See Exh. A.

In one of the fraudulent transactions, Vatcher's salespeople negotiated with Hermes, which was negotiating a separate deal with the Australian Army. A salesman under Vatcher's authority obtained a purchase order from Hermes in the amount of $350,000. The purchase order, however, expressly stated that the sale was contingent upon Hermes completing its deal with the Australian Army. Under accounting rules, revenue from the deal could not be recognized because the deal was contingent to get around this accounting rule, Vatcher instructed his salesman to "white out" the contingency language from the purchase order so they could fool Inso's accounting department into recording the purchase order as revenue in time for the end of the quarter. The sale was then booked during that quarter (the second quarter of 1998). As a result, Inso overstated its revenue for the $350,000. See id.

In another fraudulent deal, Vatcher obtained a purchase order from Toshiba for $1,000,000. Vatcher had a side agreement with Toshiba, however, making the deal contingent upon a sale to another company. Nevertheless, the sale was booked as revenue. Consequently, Inso overstated its revenue for the second quarter of 1998 by approximately $989,000. See id.

Vatcher orchestrated another fraudulent deal with Toshiba in the first quarter of 1998. On the last day of that quarter, Vatcher convinced Toshiba to issue a purchase order for $485,760 of Inso product. Toshiba's purchase order plainly stated that it was

"temporary."  When questioned about the purchase order, Vatcher falsely said the word

"temporary" simply referred to the numbering of the purchase order, not to the

underlying order.  Vatcher also failed to disclose his side deal with Toshiba that absolved

Toshiba of any responsibility for the purchase.  This deception resulted in Inso

improperly recording $422,000 of revenue in the first quarter of 1998.  See id.

The information described three other fraudulent transactions as well: (1) a deal

with Software Distribution International in the second quarter of 1998 which resulted in

an overstatement of $261,000 in revenue; (2) the deal with The Research Group,

described supra., which resulted in the overstatement of $935,000 in revenue; and (3) a

deal with Media Gold France in the third quarter of 1998 which resulted in an

overstatement of $394,000 in revenue.  See id.

Clearly, Vatcher 's multiple instances of fraud contributed greatly to the loss to

Inso shareholders.

## 2.  There Were Additional Factors that Substantially Contributed to the Loss.

There were other factors that impacted the price of Inso's stock aside from

Vatcher's fraudulent conduct.  The following extrinsic factors – having nothing to do

with any fraud or with Hill whatsoever – also impacted the price of Inso stock:

The price of Inso stock was no doubt affected by the general state of the market.

During the late 1990s and into 2000, the marketplace for stocks of high-tech companies

was extremely volatile.  And Inso, which had reported only negative earnings, was even

more risky to investors regardless of any fraud or restatement of revenue.

In addition, the decline price of Inso stock that occurred after the restatement was

not related solely, and perhaps not primarily, to the restatement.  As the prosecution's

expert testified, as a general matter, stocks in the high-tech industry declined substantially if a company fell short of its revenue and earnings target for a particular quarter. And that is precisely what happened to Inso's stock after it missed its target in the second quarter of 1997, when that shortfall of 10 – 15% was announced, Inso's stock price declined nearly 50%. In its announcement that revenue had been overstated in the first through third quarters of 1998, Inso revealed other bad news: it would miss its revenue targets for the fourth quarter of 1998, and it would miss by a substantial margin. By way of comparison, the amount of restated revenue for the first three quarters of 1998 was approximately 13% of total reported revenue for that period. But the expected shortfall for the fourth quarter was double the amount of the restated revenue: the projected shortfall was nearly 30%. Using the 1997 incident as a benchmark, it is abundantly clear that Inso's expected shortfall of 30% had a substantial and negative impact on the price of Inso stock in and around the fourth quarter of 1998. In sum, the value of Inso's stock was directly related to whether it met its projected targets for each quarter; when Inso's quarter fell short, the stock declined in value, sometimes by substantial sums.

Also, by the time Inso recognized revenue from the September 30, 1998 purchase order and announced its third quarter revenue, the value of Inso's stock had already been influenced by Vatcher's phony deals that Inso recorded in the first and second quarters of 1998. The announcement of revenue from Vatcher's fraudulent deals had artificially and fraudulently inflated the value of Inso stock before Hill had any involvement whatsoever in the deal with Chan.

Finally, as the PSR recognizes, Inso was a genuine business with active operations. Any number of Inso's operations could have, and likely did, contribute to the

value of its stock. Accordingly, the entirety of Inso's stock value during the fraud cannot be attributed to inflated revenue reports. <u>See</u> PSR, ¶ 73.

### F.  The Agreed-Upon Loss Calculation is Not Based Upon Actual Losses.

The PSR recognizes that "actual losses were only suffered by those investors who purchased during the period when the stock prices were elevated due to the inflated revenues and then sold after the disclosure that the company's earnings would be restated." PSR, ¶ 72. Yet the agreed-upon potential loss is based upon the *total* number of outstanding shares, not just those shares that were traded during the relevant time period. <u>See</u> PSR, ¶ 77 (calculating potential loss by multiplying median price of shares times total number of outstanding shares).

Where – as here -- the stock still has value after a fraud is exposed, using the total number of outstanding shares as a proxy for the number of victims overstates the loss. <u>See</u> <u>United States v. Snyder</u>, 291 F.3d 1291, 1296, <u>reh'g</u> <u>denied</u>, 48 Fed.Appx. 744 (11th Cir. 2002).

### G.  The Price of Inso Stock Rose by Late 1999, Largely Due to Hill.

The potential loss also overstates the seriousness of Hill's offense because the stock's loss of value was not permanent.

In the summer and spring of 1999, Hill and others in Inso's upper management[4] realized that Inso would perform better if it sold off certain divisions and focused its strategy on its Document Exchange and Web Publishing businesses. To that end, Hill initiated and negotiated the sale of two divisions: Dynatext, which sold for approximately $15,000,000, and Sherpa, which sold for approximately $10,000,000.

---

[4] By this time, CEO Vana-Paxia, CFO Savage, Vice President Savage and Vice President Marshall had left Inso.

Consequently, by mid-December of 1999, Inso's stock rose to a high of $38.00 per share, an amount significantly higher than both the price per share when Inso recorded the September 30, 1998 purchase order and made the corresponding announcement and the price on January 29, 1999, the last trading day before Inso announced the restatement.

### H.  Hill Did Not Make a Profit.

Also, this Court should consider that, unlike other members of Inso upper-management, Hill did not sell a large number of his shares and make a substantial profit in the weeks and months following Inso's announcement that it had met its target for the third quarter of 1998.[5]  CFO Betty Savage sold shares of Inso stock in November, 1998 for a profit of nearly $350,000.  She sold even more shares in January, 1999 for approximately $1,000,000.  Vice Presidents Savage and Marshall, as well as other members of Inso upper management, also sold large numbers of shares during the same time period and profited heavily.

Hill, however, did not sell off large quantities of his shares during this time; if he had, he would have accrued a handsome profit.  But he was not opportunistic, and, in fact, he demonstrated his continued commitment to and belief in Inso's potential.  He did not even sell his in December of 1999, when the stock rose again in value.  Hill – who had purchased Inso stock through an employee program – actually held onto the vast majority his stock and sustained a loss.  Simply put, Hill was not looking to make a quick buck.

For the reasons set forth above, using the amount of loss to determine an appropriate sentence grossly overstates the seriousness of Hill's perjury.

---

[5] On November 23, 1998, Hill sold a small number of shares, approximately 2600. CEO Vana-Paxhia also sold a small amount, i.e. 4000 shares.

### III.    THIS COURT SHOULD DEPART DOWNWARD BECAUSE HILL'S ACT OF PERJURY WAS ABERRANT BEHAVIOR.

Because the loss occurred in 1999 (after Inso publicly announced that it had improperly overstated revenue for the third quarter of 1998), a departure for aberrant behavior should be judged under the factors identified by the First Circuit in United States v. Grandmaison, 77 F.3d 555 (1st Cir. 1996).[6]

Grandmaison clarified that an aberrant behavior departure is available to first-time offenders "whose count of criminal conduct involves more than one criminal act[.]"  Id. The Court explained, "we think that focusing on the crime of conviction instead of the criminal acts committed in carrying out that crime best comports with what the Commission intended."  Id.  Grandmaison also held that a sentencing court should base its decision upon the totality of circumstances.  See id. at 563.  Relevant factors include whether a defendant profited from his conduct and whether a defendant mitigated the effects of his conduct.  See id.

Hill more than meets Grandmaison's criteria.  He has no criminal record.  And he was convicted of a single crime:  perjury.  Even if this Court considers Hill's actions in 1998, those acts were limited in duration:  on September 30, 1998, he did nothing but draft a purchase order at the direction of Inso's CEO.  And in late December of 1998, he obtained a check for the purchase order and negotiated the letters of credit.

Furthermore, prior to and since he committed his offense, Hill has been widely known as an honest and honorable man.  Several people have written in Hill's support explaining that his offense was an errant occurrence in his otherwise law-abiding life.

---

[6] A Guideline amendment effective on November 1, 2000 abrogated in part the factors adopted by the First Circuit in Grandmaison.

Friend and colleague James Carroll writes, "I find it impossible to square in my own mind the character and integrity of the Bruce Hill that I have known for many years with the fellow portrayed in the litigation.  Perhaps all I can offer in this respect is the observation that the conduct alleged is simply and entirely inconsistent with the manner in which I personally observed Bruce live his life for many years."  Exh. B.

Philip Brown writes that, he has "always known Bruce to be candid and honest in his dealings" and that "[r]egardless of what happened with his testimony before the SEC and regardless of his conviction, I still believe that Bruce is a truthful and upright individual and I still trust him as such." Exh. C.

Arthur Aaron echoes the same sentiments, and says that Hill "is quite simply one of the best, brightest and most honorable men that I have ever known."  Exh. D. During the time they worked together at Skadden Arps, Aaron explains, "[w]hether in the course of research, due diligence or negotiation, [the lawyers at the firm] counted on Bruce to do well and to do the right thing;"  Aaron also notes that Hill had "a moral compass that pleased and impressed all those who worked with him." Id. See also Exh. E (letter from Mark Conners, stating "I can truthfully state that Bruce and his wife, Connie, are the two most honorable people I know.  Their personal integrity is so absolute and their actions so sincere that it's legendary in our town.")

Moreover, as discussed supra., Hill did not profit from his conduct.  In fact, just the opposite is true:  unlike others who profited when Inso's stock reached its high points, Hill held onto to his shares through the good and bad times, ultimately losing his investment in Inso.

Hill's older brother Allen explains that, even as a child; Hill was honest.  He writes that "[a]s youngsters, we fought as well as played together.  When my father, who was then quite an intimidating figure, would ask what was going on, Bruce would always answer honestly, whether it reflected well or ill upon him.  Through all the competition growing up, and all that I have known of him since, he always does his best to succeed but always within the rules.  All our conversations as grownups, about our life and work, have confirmed the impression that honesty and integrity are core to Bruce's makeup."  Exh. F.

Finally, and further evidencing his truthful and honorable character, Hill was the one who acted to expose Vatcher's frauds by initiating the investigation which ultimately led to Hill's own conviction.  Clearly, Hill is not an ordinary defendant.  Although he committed a serious crime, historically, he has been an honest and accomplished man.  This conviction is a scar on an otherwise exemplary life.

Under the totality of these circumstances, it is abundantly clear that Hill's criminal conduct was an aberrant incident in his life.  Accordingly, he respectfully requests that this Court depart downward from the advisory Guideline sentence.

## IV.    THE SECTION 3553 FACTORS WEIGH IN FAVOR OF LENIENCY.

In the post-*Booker* world of federal sentencing, this Court must now consider factors it could not have considered in the past.  Specifically, this Court must now consider those factors set forth in 18 U.S.C. § 3553(a):

- The nature and circumstances of Hill's offense;

- Hill's personal history and characteristics;

- Hill's need for training, education, and services; and

- The need for the sentence imposed, in light of:

    o The seriousness of Hill's offense;
    o Deterrence considerations;
    o Concerns of recidivism; and
    o The need to protect the public from Hill.

This Court is also free to consider other relevant factors, including those

previously discouraged or even forbidden by the Guidelines.

A. **The Nature and Circumstances of Hill's Offense Call for Leniency.**

The circumstances giving rise to Hill's conduct militate against a harsh sentence.

As this Court may recall from the trial, many of Inso's senior executives were involved in

the procurement and payment of the September 30, 1998 purchase order:

- CEO Steven Vana-Paxhia and Vice President of Sales Paul Savage were the ones who decided, late in the day on September 30, 1998, to bring a distributor into the US Airways deal so that Inso could record revenue in the third quarter.

- Graham Marshall, Vice President of Inso's Electronic Publishing division, was the one who negotiated the purchase order with Chan, and the one who made the alleged side deal.

- CFO Betty Savage made the decision to record the September 30, 1998 purchase order as revenue, despite her failure to conduct any sort of credit check on Chan or Hong Hong Corp.

In contrast, Hill's involvement was very limited: he did nothing more than draft

the purchase order. And Hill had nothing to do with negotiating or closing that deal. He

simply drafted the document at the behest of CEO Vana-Paxhia and Vice President Paul

Savage.

As for obtaining payment for the September 30, 1998 purchase order, and

negotiating the distribution agreement and the corresponding letters of credit, Hill did

nothing more than follow the directions of Inso executives: Vana-Paxhia gave Hill three

very specific objectives to accomplish on his trip to Malaysia, including the receipt of payment for the September 30, 1998 purchase order.  Likewise, CFO Betty Savage told Hill that Inso needed to obtain payment for the purchase order by December 31, 1998, in order to recognize the OEM deal as revenue during the fourth quarter of 1998, as well as to accomplish a more favorable "Days Sales Outstanding" statistic.

And it should not go unnoticed that these senior-level executives[7] -- all of whom were older and more experienced than Hill -- received either immunity for their testimony or "no target" letters, thereby avoiding exposure to prosecution and punishment.  In essence, Hill, the youngest and least experienced Inso executive, was hung out to dry while his superiors walked away scot-free.

> ## 2.    Hill's Personal History and Characteristics Weigh in Favor of Leniency.

Hill is also a devoted family man.  He has been married to his wife, Connie, for 20 years.  Together, they have two sons, Lincoln and Winston, ages 14 and 16.   As Hill's supporters explain, he is actively involved in all facets of family life.

Family friend Howard Swartz explains that Hill "has been actively involved with the boys in their academic, family, and athletic activities.  The boys reflect the finest family values.  They are very bright, respectful, musical, athletic, and clearly well taught at home.  Bruce takes great pride in their accomplishments.  Bruce, Connie and the boys enjoy each other's company enormously and are a proud and loving family.  The entire

---

[7]Only two others faced prosecution:  Vatcher, who was Vice President of International Sales (and who struck a cooperation agreement with the prosecution), and Marshall, Vice President of Electronic Publishing.  Marshall is now deceased.  Vana-Paxhia, Paul Savage and Betty Savage were among those who received immunity or a "no target" letter.

family is well respected in the community, and their participation in community events is frequent, highly competent and appreciated." Exh. G.

Hill's brother Allen writes, "Bruce is a very strong family man who loves, supports and nurtures his wife and two teenage sons…I know he treasures every moment with them, and, rather than pursuing self-absorbing hobbies, he's tried to make engaging them his hobby activity, from playing baseball with them to helping them with homework. He and Connie have done a great job in raising their two sons and I hope that Bruce will continue to have the opportunity to influence their lives and decisions as they grow through high school and college." Exh. H.

Hill's wife of 20 years, Connie, poignantly describes her husband's commitment to their children:

> No matter the season, playing in the back yard was important for our active boys so Bruce would run, jump, throw or catch a ball or just be plain silly with them until they would collapse in a happy heap of exhaustion. As our boys developed an interest in baseball, Bruce would patiently help them with their baseball swings, pitching to them until his shoulder ached. Even though our boys are bigger now, they still want their father to take them to the field to play baseball.
>
> Bruce has always led by example, from instilling in our sons a deep commitment to family, to importance of honesty and integrity, a love of history, to teacher our boys the finer points of baseball and the intricate steps of making a chocolate pie. I am proud that Bruce is my husband and the father of our children.

Exh. I.

Hill remained actively engaged in his sons' lives, even in the midst of this case. As his father explains, "[d]espite the fact that Bruce became a father at the very time in a young lawyer's career when the work demands are absolutely inhuman, he always found a way to make time for Winston and Lincoln. During their school careers Bruce has

always been actively involved in their school projects, their musical practices and

performances and their sporting activities, whether on school teams or in summer

leagues.  Even in these last three years of continuous legal preoccupation, Bruce's

engagement with and commitment to his sons has remained a constant priority." Exh. J.

      **3.**      **Hill Has No Need for Educational or Vocational
Services.**

Hill is a law school graduate.  And, even though he has lost his license to practice,

he remains gainfully employed and able to provide for his family.  Incarceration will not

fulfill any need for educational or vocational training.

      **4.**      **There is No Risk of Recidivism or Need to Protect
the Public.**

According to a new study issued by the Sentencing Commission, there are several

factors that indicate Hill is not likely to recidivate:  he is highly educated, has no history

of drug use, and is being sentenced under the fraud guidelines.  See Exh. K at pp. 12 and

13.

Further, Hill's offense of conviction occurred over 5 years ago; it has been more

than 7 years since he drafted the September 30, 1998 purchase order.  In the passing

years, he has been a productive member of society and has not committed any subsequent

offense. Also, as a result of the SEC settlement, Hill may no longer serve as a director or

officer of a publicly traded company.  Moreover, he has lost his license to practice law.

For all these reasons, the possibility that Hill would re-offend is virtually non-

existent.

5. **The Deterrence Factor is Satisfied by the Collateral Consequences that Hill Has Already and Will Continue to Suffer.**

As a result of his conviction, Hill has suffered several collateral consequences:

- He lost his license to practice law;

- He must pay nearly $100,000 to settle a related SEC case; and

- He is no longer able to serve as director or office of any publicly traded company; and

- His reputation and stature in his community has suffered.

Moreover, Hill has had to live with the knowledge that his family has endured great stress and anxiety for nearly 7 years. As Hill's mother explains, his sons, "now 14 and 16…have lived for years with this underlying distress and anxiety. Their father is the kingpin of their universe, and they rely on him in ways they don't even realize." Exh. K. Hill's prosecution and conviction have also taken their toll on his grandparents. See id.

3. **The Conduct For Which Hill Was Convicted Is Very Remote in Time.**

Hill was convicted for perjury that occurred more than five years ago, in November of 2000. And the loosely related fraud dates back even further: to late 1998 and the first days of 1999.

He has lived under the cloud of investigation since February 1, 1999, when the SEC began its investigation. Since that time, Hill has complied with each and every condition of his release. He was even entrusted to travel extensively overseas while on release, visiting countries such as Japan, England, France, Germany and Switzerland.

In addition, despite being under investigation and prosecution for so long, Hill has accomplished extraordinary achievements. He remained with Inso until May of 2000. Earlier that year, Hill was given the responsibility of streamlining Inso's business, selling off substantial parts of Inso's business (which, in turn, caused the stock to increase in value). For the next several months, he worked as a consultant, providing assistance to companies engaged in e-business that were interested in merging with or acquiring other businesses. Also, from October of 2000 until January of 2002, Hill was the Vice President of software company Mobile Q, Inc. In that capacity, he was responsible for forging relationships with other companies and pursuing future business opportunities.

In February of 2002, Hill formed a partnership with Charles Hale. See Exh. L. The partnership purchases struggling software companies and then invests in and operates them, liquidates them, or sells them. Currently, the partnership owns and operates two software companies, providing gainful employment to nearly 60 people.

In April 2002, the partnership purchased Summit Design, a software company in Los Altos, California that was about to be liquidated by its parent company. Today, Summit Design employs 45 people. During the first year after the acquisition, the partnership operated Summit Design on a day-to-day basis, restoring it to financial health. See id.

In 2003, they purchased Sightline Systems which, at the time they purchased it, was bankrupt and unable to pay its employees and suppliers. Hill, with Hale's assistance, turned Sightline Systems around. Today it employs 14 people, and provides 15 to 20 other people with employment as distributors. Hill is actively involved in the day-to-day operations of Sightline, and his absence would likely have an adverse economic impact

on the company, as well as its employees and distributors.  Hill's involvement with

Sightline Systems is so critical that, if he is incarcerated, it is likely that at least some

employees will lose their jobs.  See id.

Hale explains Hill's many contributions to the partnership and the companies it

owns:

> Bruce was an integral part of [the acquisition of Summit
> Design and Sightline Systems].  He led negotiating and
> closing the transactions.  He led the operations and operating
> plans that have restored both companies to financial health.
> Our investors (who know of Bruce's situation) have profited
> significantly.  The employees have seen their compensation
> increase significantly.  What we most cherish about these
> companies, however, is what Bruce has been most successful
> doing: building a working environment that has allowed our
> employees to learn, grow in capability and responsibility,
> solve problems for themselves and others, and succeed.
>
> There are many good business people in the world.  What is
> remarkable about Bruce, and what I find so difficult to accept
> with his legal travails is that he does not bend rules, cut
> corners, or take actions inconsistent with what is ethically
> right.  Life is filled with tremendous pressures and
> circumstances that seem extenuating.  Since 1996, I have seen
> Bruce make misstates.  I have not once seen him act
> unethically.  I have not once seen him bend to extenuating
> circumstances.  I have not once seen him place money over
> values.

Id.

Darryl McPherson, an employee of Sightline Systems, explains that "Mr. Hill

plays an integral role in the day-to-day operations at Sightline Systems, while providing

use with vision and direction for continued profitability and success.  This stands in sharp

contrast with the position I and my colleagues found ourselves in three short years

ago…."  Hill's contributions are so significant and so integral to Sightline Systems

success, McPherson explains, that while Hill was preparing for his trial (and not present

as often as normal), [t]he driving force of Sightline Systems was absent." Exh. M.

McPherson opines that the loss of Hill for any length of time would be to the detriment of

all employees and their families." Id.  Likewise, Debra Ray, Sightline System's Manager

of Customer Service, writes that "Mr. Hill's excellent judgment and steadfast leadership

have led to a dramatic turnaround in the success of this software company….Without his

efforts, it's possible that the company would not be in business today.  It would be a great

loss to our business if Mr. Hill's input into day-to-day management decisions was not

available." Exh. N; see also Exh O. (letter from Christopher Merrill, Vice President of

Sales, Sightline Systems).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant Bruce G. Hill respectfully requests that this

Court sentence him to a term of house arrest for one year.