UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>BRUCE GORDON HILL,<br>　　　　Defendant. | )<br>)<br>) CRIMINAL NO. 03-10344-DPW<br>)<br>)<br>)<br>) |

<u>UNITED STATES' SENTENCING MEMORANDUM</u>

Following a mistrial on all but one count of the Indictment, the parties have forged a compromise agreement with respect to the calculation of the applicable sentencing guidelines in this case. In the wake of the Supreme Court's decision in <u>Booker</u>, determining the guideline sentencing range (GSR) is a first step in the process of identifying a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). While the Court may consider factors that are not identified in the Sentencing Guidelines, and may re-weigh factors that are addressed by the Sentencing Guidelines, in the matter at bar the agreed-upon guideline calculation ultimately reflects a fair and reasonable balancing of the pertinent mitigating and aggravating factors.

1. <u>Real Offense Conduct Versus the Count of Conviction.</u>

In this case, the most difficult issue in evaluating "the nature and circumstances of the offense" is that there is no jury verdict adjudicating beyond a reasonable doubt that Bruce Hill joined in the underlying criminal conduct in respect to which he committed perjury.

The parties have compromised on this point with respect to the calculation of the GSR. That is, by treating Bruce Hill in effect as an accessory-after-the-fact (pursuant to U.S.S.G. §2J1.3(c)(1)), the parties have endorsed a GSR that is roughly 8 levels higher than a "stand-alone" perjury conviction and roughly 6 levels lower than a fraud conviction. But the parties'

compromise in calculating the GSR does not extend to the weighing of departure grounds, nor to the weighing of factors that might, post-<u>Booker</u>, be relevant in deciding whether a sentence outside the GSR might be appropriate. Accordingly, a more fulsome review is necessary.

At the outset, it is essential to consider whether, as he now insists, Hill's perjury was an isolated freak incident (in which case the parties' agreement as to the GSR could be seen as a perverse overstatement of his culpability), or whether Hill's perjury arose from his involvement in a fraudulent scheme to misrepresent Inso Corporation's true revenues.

Without re-hashing all of the factual arguments made at trial, the United States' submits that the evidence of Bruce Hill's involvement in Inso revenue-recognition fraud is overwhelming. Hill, like the others who participated in the initial September 30, 1998 effort to cover the hoped-for U.S. Airways' purchase of software, intended at the outset only to patch together a short-term solution (one that would never be "tested" for genuineness), and expected no harm would befall Inso's shareholders. By October 15, however, the U.S. Airways deal still had not closed, yet the die was already cast and Inso went ahead and issued a press release trumpeting Q3 results that included the hoped-for sale. Thus a temporization at the end of the third quarter had blossomed into a full-blown fraud and cover-up by the time Hill traveled to Malaysia at the end of the year. In carrying out his "mission impossible" to Malaysia, Hill was well aware of the circumstances that occasioned his urgent intervention in the matter. However reluctantly he may have been drawn into it, Hill wound up playing the central role in the fraud whereby Inso reported collecting roughly $3,000,000 from Hong Hong for a sham software sale, all in an effort to keep Inso's stock price soaring.

Whether or not it constitutes "law of the case" in a formal sense, this Court's <u>Petroziello</u> finding during the trial reflects the only fair reading of the preponderance of the evidence: Bruce Hill participated in a conspiracy, as charged in the Indictment, to falsely represent Inso's

2

revenues. While the United States does not ask the Court to sentence Mr. Hill as if he had been convicted for his role in that fraud,[1] the Court's finding – by a preponderance of the evidence – allays any concern that it is unduly harsh to sentence Hill as an accessory-after-the-fact. Likewise, that Hill was a central participant in the underlying criminal activity allays the common concern that punishing perjurors as accessories-after-the-fact might expose them to punishment based on the magnitude of underlying criminal activity of which they are unaware.

    2.    <u>The Parties' Guideline Calculation Fairly Reflects the Seriousness of the Underlying Offense.</u>

In his sentencing memorandum, Hill contends that the parties' agreed-upon guideline calculation, particularly the calculation of loss, overstates the seriousness of Hill's offense. He offers several arguments in support of this position, none of which is ultimately persuasive. This memorandum addresses Hill's arguments in the order they are presented. But first, some discussion of the loss calculation reflected in the PSR is in order.

There are numerous methods of computing loss in securities fraud cases. All of them yield different results. <u>See</u> <u>generally</u> <u>United States v. Grabske</u>, 260 F.Supp.2d 866, 867-75 (N.D. Cal. 2002) (reviewing various computational methods).

Most courts that have addressed the issue have adopted some form of market capitalization measure. That approach compares average stock prices during the period of the fraud with average stock prices during the period after the fraud was disclosed (prior to the next independent business development that would be expected to move the stock price). <u>See, e.g.</u>,

---

[1] After <u>Booker</u>, as before, sentencing decisions properly rest on judicial findings of fact, by a preponderance of the evidence. <u>See</u> <u>United States v. Antonakopoulos</u>, 399 F.3d 68, 75 (1st Cir. 2005) ("The error is not that a judge (by a preponderance of the evidence) determined facts under the Guidelines which increased a sentence . . . .").

United States v. Eyman, 313 F.3d 741 (2d Cir. 2002); United States v. Moskowitz, 215 F.3d 265 (2d Cir. 2000); United States v. Hedges, 175 F.3d 1312 (11th Cir. 1999).

As the Fifth Circuit has noted in a recent decision, gross drop in market capitalization measurement is not necessarily the best measure of loss in cases involving "fraudulent transactions that 'cook the books' and prop up a company's stock but do not, aside from the exceptional Enron or WorldCom situation, render the company worthless." United States v. Olis, 429 F.3d 540, 547 (5th Cir. 2005). That observation applies here.

Following Inso's February 1, 1999 announcement that it would have to restate its previously announced revenues, Inso's stock price fell from $25.00/share to $9.40/share. The overnight diminution in Inso's market capitalization was more than $241,924,800 million ($15.60 per share times 15,508,265 Inso common stock shares outstanding).[2]

An alternative approach to measuring loss, the "out-of-pocket loss" analysis (which considers losses to investors who purchased during the period of the fraud and sold after the disclosure of an earnings restatement) would be well suited to the situation in this case. However, sufficient detailed trading data is not available to perform a true "out-of-pocket" loss analysis. A crude approximation (multiplying total trading volume during the fraud period by the difference between the median share price during the fraud and the prevailing price after the

---

[2] It is common to consider a longer period (before and after a restatement) in order to even-out any short term distortions from "panic" selling following an announcement of bad news. Doing so in this case makes little difference, however, since Inso's stock price continued to fall for several months after February 1, 1999. Weighing average stock prices for a four month period before and after February 1, 1999, yields an average price difference of $15.44 per share and a drop in market capitalization of $239,447,611. ($15.44/share x 15,508,265 = $239,447,611).

fraud ended) suggests that such an approach would yield a loss figure lower than $241 million, but much higher than the approach followed in the PSR.[3]

The approach followed in the PSR is intended to address some of the same concerns as the out-of-pocket loss measure. It takes into account: (a) that the losses here arise from the falsification of operating results of a company that was, on the whole, a legitimate business enterprise [as opposed to a "pump and dump" stock manipulation scheme]; (b) that Inso stock was a speculative high-tech "growth" stock, with an element of inherent risk to investors [i.e. even without any fraud, investors who bought Inso stock before October 15, 1998 would have lost money when the company announced its true revenue results]; and (c) that Hill was responsible only for a portion of the fraudulent activity at Inso, since Richard Vatcher's fraudulent sales were, in the aggregate, larger than the September 30 "Hong Hong" deal.

The PSR effectively ignores, for purposes of loss calculation, the drop in Inso's share price from the pre-October 15, 1998 levels ($17.75/share) to the post-February 1, 1999 levels (below $9.40/share). That loss, after all, was occasioned simply by telling the truth and, presumably would have occurred (albeit months earlier) without the fraud. Instead the loss calculation in the PSR seeks captures the "run-up" in Inso's share price following the October 15 earnings announcement. PSR ¶¶75-76. While the stock price peaked at around $29/share, it can

---

[3] Total trading volume from mid-October 1998 through January 29, 1999 was approximately 10,904,850 shares [½ of total volume for October, plus total volume for November through January]. All of the shares that were traded in the relevant period were purchased at prices that were inflated as a result of the fraud. If Inso had truthfully disclosed its results of operations on October 15, stock prices would have been much lower (presumably at or near the levels that prevailed after the fraud was disclosed and accurate financial results were reported). The difference between the median price paid for Inso stock during the relevant period ($23.38/share) and the price of Inso stock after disclosure ($9.40/share) is $13.98. Multiplying this median price difference by the approximate number of shares purchased during the period between October 15, 1998 and January 29, 1999 would yield a "loss" figure of $152,449,803. ($13.98/share x 10,904,850 shares = $152,449.803).

fairly be assumed that only a small percentage of investors bought at the very apogee of the price run-up.  Accordingly, the PSR looks to the median share price during the fraud period ($23.38) to more fairly capture the typical impact on Inso investors.  PSR ¶77.  Based on the difference between this median price during the fraud and the pre-fraud price, the PSR identifies a total loss to shareholders of roughly $87.3 million dollars.  PSR ¶ 77.  By attributing less than half of this figure to the fraud in which Hill participated [on the assumption that the remainder arises from un-related frauds effectuated by Vatcher], the PSR puts the loss in this case below $40 million.

In short, while the loss figure is the product of a series of estimates, the underlying assumptions are fundamentally conservative, and favorable to Mr. Hill.  Such estimates are an entirely appropriate measure of loss.  See  U.S.S.G. §2B1.1, comment. (n. 3) ("The court need only make a reasonable estimate of loss, given the available information.  This estimate, for example, may be based upon the approximate number of victims and the average loss to each victim, or on more general factors such as the scope and duration of the offense.").

    a.    Hill's Role In Exposing The Fraudulent Transactions

Hill's  makes much of the fact that, when he learned of fraudulent transactions by Richard Vatcher, he moved promptly to open an investigation and caused Inso to engage outside counsel for that purpose.  Defendant's Mem. at 3-5.  The United States does not contest Hill's account of his role in exposing Richard Vatcher's crimes (which were blatant and which would inevitably have been uncovered by Inso's auditors within a matter of days or hours).  But the United States reminds the Court that, on the very day that Hill and other senior Inso officials suspended Vatcher, Hill, Marshall and others were relieved to learn that Mr. Chan had finally wired Inso $3,000,000 in "payment" for the September 30 purchase order.  Plainly, Mr. Hill did not expect or intend to disclose his own criminal wrongdoing when he threw Mr. Vatcher to the

wolves. In that the PSR calculation of loss does not attribute any of Mr. Vatcher's fraud to Mr. Hill, there is no occasion for a departure on this basis.

      b.      Hill Has Been Convicted Only Of Perjury

As noted above, it appears to be Hill's position that, because the jury was unable to reach a verdict on the fraud counts, his perjury should be treated as if it arose in a vacuum, unconnected to any of the circumstances or motives that prompted it. Defendant's Mem. at 5-7.

There is no doubt that Hill's perjury occurred after the fraud was complete and, in that sense, Hill is correct that the perjury did not itself cause loss to any victim. Defendant's Mem. at 6. But this is almost always the case with a perjury conviction and it is why the sentencing guidelines appropriately treat the perjuror <u>not</u> as a participant in the underlying offense, but as an accessory-after-the-fact. Hill notes that there is a big difference between the base offense level for a "stand-alone" perjury (level 12) and for participation in a large-scale securities fraud. Defendant's Mem. at 7. But the parties' agreement puts Hill, as an accessory-after-the-fact, roughly mid-way between the two.

      c.      Hill's Deals with Chan Did Not Result in the Improper Recognition of Revenue.

Hill insists that none of his deals with Chan – by which he apparently means the deals negotiated in December 1998 – resulted in the improper recognition of revenue. Defendant's Mem. at 7-8. Even if it is literally true, this assertion begs the issue.

The entire purpose of Hill's end-of-year machinations was to cover up the fact that Inso had <u>already</u> recorded roughly $3,000,000 in phony revenue, based upon the September 30 purchase order. Nor can it be ignored that Hill is the one who concocted the September 30 purchase order. Others within Inso were at least as culpable as Hill with respect to the events of September 30, but Hill was by no means innocent. Hill claims he was unaware that Marshall

7

promised Chan that Chan would not have to pay for the software he was "buying" on September 30, but Hill was Inso's general counsel and was a key negotiator in the hoped-for U.S. Airways deal. Hill knew there was something deeply amiss in a transaction whereby Inso's largest "sale" of the quarter was made to a "customer" who had expressed no interest in purchasing anything from Inso prior to the evening of September 30.

Hill may have been ignorant of some details of Marshall's conversation with Chan on September 30, but the evidence shows that Hill knew: (1) the U.S. Airways deal had not closed, leaving Inso short of its revenue targets; (2) $3,000,000 in software is not an "impulse" purchase; (3) the "sale" was memorialized in a one-page "purchase order" which Hill improvised on the spot (rather in than the 20-plus page standard licensing agreement Inso used for even routine sales of software); (4) the terms of the contract were not subject to any review or negotiation by the "buyer"; (5) the price of the goods changed between drafts of the "purchase order" without input or negotiation by the putative buyer; and (6) the document did not even name the purchaser, it left a blank for the purchaser to fill in his own name. This evidence rebuts Hill's claim that he had no "reason to believe that the [Hong Hong] transaction was not a <u>bona fide</u> one." Defendant's Mem. at 8. By his own admission, moreover, when Hill left for Malaysia, he knew Chan did not expect to pay for the September 30 purchase order until the U.S. Airways order came through. <u>See</u> SEC Testimony of Bruce Hill, Nov.9, 2000 ("I believe Graham expressed an issue not so much with Mr. Chan's ability to pay as his willingness to pay the Q3 receivable in the absence of an offsetting transaction from Sabre, US Air or some third party.).

It is difficult to imagine that Hill, with his exceptional legal acumen, would have made the legally and morally disastrous choices he made in and after December 1998 were it not for the fact that he had already associated himself with the fraudulent venture, at a time when it

8

looked like a harmless "placeholder" transaction. Plainly Hill's prompt denunciation of Vatcher shows that he recognized obvious wrongdoing when he viewed it from a more detached vantage.

          d.      "Hill Did Not Make Any Misrepresentations That Led to Improper Recording of Revenue."

Hill's contention that he did not make any misrepresentations that led to the improper recording of revenue (Defendant's Mem. at 8-9) is not accurate. Leaving aside Hill's role in preparing the September 30 purchase order, a major purpose of Hill's trip to Malaysia, and of Hill's faxing back a worthless check (in Malaysian Ringgats) as "payment" for the September 30 purchase order, was to allow Inso to recognize revenue on its sale of software to Chan in the Q4 OEM deal. While the OEM deal was a *bona fide* transaction, Hill knew that GAAP rules precluded Inso from recognizing revenue from that deal while the buyer had a large outstanding receivable. Based on the worthless check, Inso's accounting staff cleared Hong Hong's $3,000,000 receivable and recognized revenue from the OEM deal.

In other words, Inso did indeed improperly book revenue on the strength of misrepresentations by Bruce Hill. It *is* true, however, that this improperly booked revenue was never announced to the public, since the whole house of cards collapsed before the filing of Inso's year-end financial reports. By the time Inso publicly announced its year-end financials, all revenues from dealings with Hong Hong had been reversed. That tells us only that Hill's fraud was detected before he succeeded in compounding the gross fraud of the Q3 earnings release.

Hill also misses the mark in his assertion that the bogus "distribution agreement" which served as the pretext of handing Chan $4,000,000 worth of letters of credit "did not cause any loss." Defendant's Mem. at 8. At the end of the day, Hill negotiated an agreement with Chan to unwind the letters of credit. The net result was that Chan pocketed roughly $600,000 of Inso's

9

money. Chan was paid, not for providing any services of value to Inso or its shareholders, but for assisting Inso's management in their efforts to mislead investors. This $600,000 loss is immediate and palpable, but it is dwarfed by the tens of millions in shareholder investment that Inso's managers – including Hill – intended to, and did, sway by their fraud.

      e.      Other Factors Causing Loss

The United States agrees that much of the fall in Inso's share price following the February 1, 1999 announcement was attributable to "extraneous causes" (Defendant's Mem. at 9) and not to the fraud in which Hill participated. Unlike the cases Hill cites, however, the loss calculation in this case has already been adjusted (giving Hill a very considerable benefit of the doubt) to take into account the multiple causes of loss. As noted in the PSR, the gross loss figure here is roughly $241 million. See PSR ¶71. If that amount were ascribed to the Hong Hong fraud, Hill's arguments for departure would have some force. But it is not. Instead, with an agreed loss between $20 and $40 million, Hill is responsible for something between one-twelfth and one-sixth of the whole. He is responsible for less than one-half of the increase in market capitalization that followed the "run-up" of Inso's share price after the October 15, 1998 announcement of Inso's fraudulently inflated Q3 revenues.

      (e-1)    Loss Attributable to Richard Vatcher's Fraud

Defendant's arithmetic is slightly off in his assertion that Vatcher was responsible for "more than two-thirds of the $7,000,000 in restated revenue." Defendant's Mem. at 9. As the PSR notes, however, the primary issue is not arithmetical, but conceptual. See PSR ¶78. Vatcher's frauds were more protracted, and involved more dollars in the aggregate, but the Hong Hong deal was by far the largest of the phony revenue deals that were reported to the public for Q3 1998. The Hong Hong deal represented 65% of the phony revenue in the October 15, 1998

press release that triggered the run-up of Inso's share price. Moreover, whether Hill was responsible for one-half, or one-third of the total, makes no difference to the GSR.[4]

        (e-2)    Additional Factors Substantially Contributed to the Loss

The United States agrees that "extrinsic factors – having nothing to do with any fraud or with Hill whatsoever – also impacted the price of Inso stock." Defendant's Mem. at 11. What Hill fails to note, however, is that the loss calculation takes this into account. As noted above, the loss calculation in the PSR assumes that the lion's share of the $241 million overnight drop in the value of Inso's outstanding shares was not attributable to fraud. As with many other NASDAQ stocks at the time, Inso's share prices – before, during, and after the fraud – reflected the "irrational exuberance" of the late-1990's tech-stock bubble. The concern Hill raises is valid, but it is amply addressed in the parties' agreed-upon loss calculation.

        (f)    The Agreed Loss Figure Does Indeed Represent "Actual Losses"

Hill is correct that the agreed-upon loss figure was calculated based upon the total number of outstanding shares, rather than on the number of shares traded during the period of the fraud. Defendant's Mem. at 13. But this does not mean the ultimate loss figure is overstated. What Hill elides is that the loss amount does not reflect the overnight price drop multiplied by the number of outstanding shares ($241 million), nor does it even reflect the gross "run-up" in stock price, from the October 15 price to its price at the end of January 1999 ($114 million [see PSR ¶¶75-76]). Rather, the PSR looks to the median stock price during the period of the fraud,

---

    [4]    As noted in the PSR, the $2.9 million in phony revenue from the Hong Hong deal represents approximately 42% of the total restated amount, which leaves Vatcher responsible for approximately 58%. Quibbles about the arithmetic do not affect the guideline range, however. The PSR attributes to Hill slightly less than half of the $87.3 million in total estimated losses to Inso investors resulting from the run-up of Inso share prices following the October 15 press release. PSR ¶78. But if Hill's share of responsibility is only 42%, or even 1/3 (as Hill suggests), the loss is still well in excess of $20 million. [42% of $87.3 million = $36.66 million; 1/3 of $87.3 million = $29.1 million].

11

thereby producing a rough average loss for Inso investors. Although the measurement is an approximation, the money lost is real. Contrary to Hill's suggestion, the losses at issue in this case are not merely "potential." Defendant's Mem. at 13.[5]

As noted in the PSR, looking at actual traded shares – rather than at a median run-up price for all shares – yields a substantially <u>higher</u> loss figure ($152,449,803) than the approach adopted in the PSR. See PSR ¶77, note 7.

      (g)      <u>Subsequent Rise In Inso's Stock Price</u>

Hill notes that Inso's share price ultimately rebounded (for a short while), in the fall of 1999. Defendant's Mem. at 13. He notes that he played a leadership role at the company during these developments. But this has no real bearing on the determination of a fair and just sentence. Hill's culpability would have been no different if he had – like other senior managers – been dismissed from Inso and had gone on to work for some other company and done good work there. There is no dispute that Mr. Hill is an immensely talented, energetic and astute lawyer and dealmaker. Nor is there any dispute that the "irrational exuberance" of the late-1990's tech-stock bubble produced immense gains (some "paper," some realized) and immense losses (some "paper" and some realized) for investors. Hill undoubtedly worked hard on the transactions that

---

     [5]     As a purely theoretical matter, using share price to determine loss could produce an exaggerated estimate of actual investors' losses if a tiny group of active traders bid up the price of a thinly-traded stock, only to see the price tumble, while leaving long-term shareholders' investments intact. But even a glance at the trading data for Inso shares during the fraud period dispels any hint that this theoretical scenario occurred here. During the period in which investors traded based on fraudulent information for which Hill is responsible (October 15, 1998 through January 1999), Inso's trading volume totaled approximately 10,904,850 shares (roughly 2/3 of the total number of shares outstanding). Doubtless many of these shares turned over more than once (i.e. some investors held on to shares purchased before the fraud.) But it can reasonably be assumed that <u>not one</u> of the investors who together purchased Inso shares during the fraud period would have paid anything like the prices they did ($17.75 to $29/share), were it not for the fraud. If they bought Inso stock at all, they would have paid prices comparable to those that prevailed after truthful revenues were released (i.e. less than $9.40/share).

transformed Inso into a rather different company, leading still more investors to place highly-inflated bets on the prospects of a mid-sized tech company with some promising product lines. But that has nothing to do with this case.

      (h)    <u>Hill Did Not Make A Profit</u>

It is true that Hill did not cash out any major portion of his Inso holdings at the top of the market.  Defendant's Mem. at 14.  It seems that Hill held his Inso stock until the bitter end, as the company slid into liquidation.  <u>Id.</u>  But this has little bearing, if any, on the sentence determination.  The United States has never contended that Mr. Hill was a predator seeking a short-term "killing."  Rather, as noted above, following his grave error of judgment (and ethics) in assisting with the September 30 purchase order, which was intended only as a short-term revenue-timing manipulation, Hill plunged into the depths of fraud in order to cover-up, and to extricate himself and Inso from, the fraud he helped start.  While Hill's motives were undoubtedly mixed – keeping Inso's stock price up, concealing his role in preparing the original phony purchase order on September 30, "fixing" a desperate situation for the company – his actions were thoroughly dishonest.  That Hill's goals did not also include the pursuit of short-term profits from insider-trading does not exonerate him.

      3.    <u>Aberrant Behavior</u>

The applicable sentencing guidelines define "Aberrant behavior" as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life."  U.S.S.G. § 5K2.20, comment. (n.1).  Unless the Court accepts defendant's suggestion that Bruce Hill's perjury before the SEC was an isolated momentary lapse, the conduct at issue here does not meet the legal definition of "aberrant behavior."

13

The circumstances of this case are quite similar to those of Bernard Bradstreet, who was convicted for his role in abetting a revenue-recognition fraud at the Kurzweil Company, he was President and CFO.  See United States v. Bradstreet, 135 F.3d 46, 48  (1st Cir. 1998).   Like Hill, Bradstreet could point to a substantial history of good citizenship as a sharp contrast to the criminal conduct in which he joined and he could claim that he sought only to help his company, not to garner short-term gain for himself.  Id. at 65.  The district judge in Bradstreet rejected the government's contention that by testifying that he had done nothing wrong – which the jury's verdict implicitly contradicted – Bradstreet had perjured himself, meaning his criminal conduct was not aberrant.  Instead, the district judge found that, "the totality of the circumstances--a perceived lack of motivation by greed, an otherwise exemplary life, a record of significant charitable giving, and an impressive outpouring of support from friends and family--warranted the conclusion that Bradstreet's conduct was aberrant."  Id. at 56.

The First Circuit concluded that the district court erred as a matter of law in allowing a departure based on aberrant behavior:

> [A] departure based on a finding that the relevant criminal conduct was a single act of aberrant behavior is appropriate only where the conduct was isolated and is unlikely to recur. Yet one who testifies dishonestly after engaging in felonious dishonesty cannot credibly make either claim. One convicted of criminal dishonesty is therefore not entitled to an aberrant conduct departure if he has testified dishonestly about his criminal conduct.

United States v. Bradstreet, 135 F.3d 46, 57  (1st Cir. 1998).

There are distinctions between Bradstreet and this case.  In Bradstreet the defendant was convicted of fraud and the district court was called upon to decide whether he also perjured himself.  Mr. Hill has been convicted of perjury and this Court is called upon to decide whether that perjury was an isolated incident or whether it followed Hill's involvement in a protracted, concerted and carefully planned fraud.  In Bradstreet the defendant's perjury occurred at trial.

14

Here the perjury occurred before the SEC. But none of these distinctions make a difference to the fundamental teaching of the First Circuit's decision in <u>Bradstreet</u>: one who commits a fraud and then lies about it under oath cannot cry "aberrant behavior."

To defendant's credit, he acknowledges that the <u>Grandmaison</u> standard, upon which he now relies (and upon which the district court had rested its erroneous decision in <u>Bradstreet</u>), has been superseded by a revision in the guideline commentary. Defendant's Mem. at 15, note 6. But more important than this legalism is the fundamental unseemliness of allowing a defendant who has enjoyed a highly privileged and responsible position in our society avoid responsibility for his criminal abuse of that position by noting that in other respects he has been a good citizen. The United States does not dispute that Mr. Hill appears to be a good neighbor and a good father. While commendable, this is hardly unusual. Indeed, it would not be the least bit surprising to find – if similar reports were prepared – that all of the other individuals who bear responsibility (legal or moral) for the debacle at Inso were similarly exemplary in their personal lives. As a society we encourage and enable – with the benefits of comfort and status – such behavior on the part of those who are, at the same time, in a position to commit crimes of concealment and misrepresentation that inflict tens of millions of dollars in damage.

  4. <u>Other Factors</u>

In addition to arguing for downward departures, defendant also appeals to this Court's post-<u>Booker</u> discretion in fashioning a sentence based upon the factors set forth in 18 U.S.C. §3553. While the Court is, of course, free to consider matters that are not addressed in the sentencing guidelines, in this case the guidelines themselves fairly encompass the most relevant facts pertinent to the sentencing decision, that is: the nature and circumstances of Hill's offense, Hill's personal history and characteristics, the need for general deterrence of the kind of criminal activity at issue in this case and the avoidance of undue disparities in federal sentencing. As the

15

Supreme Court noted in Booker, "[i]n most cases, . . . the Commission will have adequately taken all relevant factors into account" in the initial GSR. 125 S. Ct. at 750.

The United States agrees that Mr. Hill has no need for educational or vocational services (Defendant's Mem. at 21) and that the risk of recidivism is low indeed (Defendant's Mem. at 21-22). In this respect Mr. Hill stands in no different position than the majority of individuals who commit similar crimes.

    (a)    Seriousness of the Offense

As for the "nature and circumstances of the offense" and its seriousness, the United States' view is that Hill's perjury was the culmination of a sustained and concerted fraud which Hill fully understood and intended would have precisely the consequences that it did (i.e., artificially inflating Inso's share price by disguising its true operating results, thereby misleading investors in their disposition of tens of millions of dollars of capital). It is unsurprising, and by no means a mitigating factor, that such fraud on Inso's investors was accompanied by a belief and hope that Inso would ultimately turn the corner so no one would lose money. Cf. United States v. Brennan, 832 F.Supp. 435, 439 (D. Mass. 1991) ("[A] belief by a defendant that ultimately everything would work out so that no one would lose any money does not require a finding that he acted in good faith. No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for those involved will excuse fraudulent actions or false representations to obtain money."), aff'd 994 F.2d 918 (1st Cir. 1993).

Among the salient circumstances of the offense here is that it involved the senior-most officials of a publicly-traded company and that its execution required – in equal measure – consummate legal acumen and consummate disregard for the fundamental criminality of the effort. This factor is adequately addressed in the guideline calculation, which incorporates a 2-level enhancement for abuse of position of trust.

16

So too, the guideline calculation fairly reflects the seriousness of the criminal activity, including, as it does, both an adjustment to reflect the extent and seriousness of the fraud activity and a six-level reduction to reflect treating Hill as an accessory-after-the-fact in his commission of perjury. The seriousness of the offense is inextricably linked to the magnitude of the losses sustained by investors. After all, those losses were no mere happenstance – the very point of the offense was to artificially sustain Inso's stock prices. Notwithstanding the complexity of arriving at a fair estimate of loss and the unavoidable air of unreality that inheres in losses that are measured in the tens of millions of dollars, the simple fact is that the impact of this crime was devastating. In the realm of "street" crimes (drugs, prostitution, loan sharking, arson and the like) true prodigies of criminal enterprise can only dream of causing $20 to $40 million in losses. While the Inso collapse did not trigger national headlines associated with an Enron's or a Worldcom, the fact remains that an arsonist would have to destroy a very substantial building to inflict similar economic loss.

    (b)    <u>Deterrence</u>

While individual deterrence (<u>i.e.</u> risk of recidivism) is a virtual non-factor, general deterrence is of great importance here. Intrinsically, crimes of "information inequality" such as the revenue-recognition fraud at issue here are extremely difficult to detect and still more difficult to prosecute. Indeed, it is the privileged position enjoyed by the perpetrators of such crimes, coupled with the low risk of detection and the great incentives and pressures to produce "results" (once known as "managed earnings") that foment such crimes. Investigating and prosecuting such crimes is fraught with difficulty. As this case illustrates, many a fraudulent scheme can be shrouded in trappings of legitimacy and quietly buried in a morass of plausible deniability and putative "business judgment." This is particularly so when the lawyers who are

17

called upon to monitor the legality of a company's activities use their skill and insight, instead, to circumvent the bounds of fair dealing and honest disclosure.

In terms of deterrence, balanced against the immense potential gains and low likelihood of detection in securities fraud cases is the fact that such criminal activity is conscious, calculated and is conducted by individuals who have legitimate means to earn a good living. Revenue-recognition fraud (and perjury aimed at thwarting the investigation of such fraud), is not a crime of passion, desperation or addiction. For street crimes, the interest in incapacitating the individual offender often overshadows any real hope of deterring others. The opposite is true here. While the interest in individual incapacitation and rehabilitation is minimal, the general deterrent "message" is large indeed. The sentence Mr. Hill has requested is patently unreasonable in this light and would send an unmistakable message that – as before the initial promulgation of the guidelines – white collar crime "pays" and prison is only for the "little people."

    (c)    <u>Individual Characteristics of the Offender</u>

As noted above, Mr. Hill's personal life appears to be unblemished. But it bears mention that the guidelines reflect – and adequately account for – a countervailing consideration. This is Hill's lack of any acceptance of responsibility for his conduct. This comment is aimed <u>not</u> at Hill's decision to exercise his constitutional right to a trial by jury. Rather, it is based on the fact that the thrust of Hill's perjury was to cast blame on others for his own fraudulent acts. Hill's perjury was intended to throw his colleague, Jonathan Levitt, under the bus when – as Levitt testified – it was <u>Levitt</u> whose qualms about the propriety of certifying a patently false board resolution prevented Levitt from signing that document.

As for his role in the underlying fraud scheme, Hill protests that he was only following orders. <u>See</u> Defendant Bruce Hill's Sentencing Memorandum ("Defendant's Mem.") at 18-19.

18

But it is no surprise that – short of a claim of diminished capacity – the guidelines do not recognize this as a significant mitigating factor.  Even if, post-<u>Booker</u>, there may be occasions when a claim of "following orders" might resonate, this is not one.  As General Counsel of Inso, <u>Bruce Hill</u> was the single best-placed person to recognize and advise against the criminality into which the company's senior managers descended.  Hill had the requisite skill and experience.  He also had the ready employability to walk away if his advice went unheaded.  Instead Hill threw himself with abandon into his "mission impossible."

Nor is it any accident that Hill and Marshall alone were prosecuted for their roles in the Hong Hong transactions.  <u>See</u> Defendant's Mem. at 19.  Other senior officials who joined in the effort to paint an unrealistically favorable picture of Inso's revenues can all reasonably claim reliance upon the legal advice and judgment of their highly esteemed and experienced General Counsel, Hill.  As the Inso official conducting negotiations on the scene in Malaysia, Hill was far more familiar with the details of the transactions than any other Inso official, even Marshall.

(d)    <u>Passage of Time Since the Crime.</u>

Hill is correct in noting that the underlying fraud at Inso took place in 1998 and 1999, and that his perjury occurred in late 2000.  Defendant's Mem. at 22.  Any suggestion that this should mitigate his responsibility for his offenses, however, is misplaced.  In particular, any insinuation that the United States was somehow dilatory in pursuing the charges against Mr. Hill is flatly wrong.  Mindful that Fed. R. Evid. 408 expressly permits disclosures for the purpose of "negativing a contention of undue delay," the United States notes that Mr. Hill and his prior counsel engaged in protracted negotiations (including detailed presentations of evidence) with the United States and that the parties entered into agreements to toll the statute of limitations for the purpose of facilitating such discussions.  Mr. Hill cannot, by his own actions, create an equitable claim for leniency based on the duration of the proceedings in this case.

CONCLUSION

While the sentence to be imposed must ultimately rest upon the statutory factors set forth in Section 3553, the agreed calculation of the applicable sentencing guidelines fairly and reasonably balances the pertinent factors and yields a sentence that is commensurate with the crime being punished.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

dated:  January 20, 2006

By: /s/ Paul G. Levenson
PAUL G. LEVENSON
Assistant U.S. Attorney
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3147

SANDY BAILEY
SCOTT POMFRET
Special Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.
dated:  January 20, 2006                    /s/ Paul G. Levenson
                                            PAUL G. LEVENSON